EDWARD J. BESHADA, BY HIS ADMINISTRATRIX AD PROSE-
QUENDUM, ELEANOR BESHADA; ELEANOR BESHADA, EX-
ECUTRIX OF THE ESTATE OF EDWARD J. BESHADA, DE-
CEASED; GEORGE J. BURDAK AND ROSE BURDAK, HIS
WIFE; JAMES D. CANNON AND BERTHA CANNON, HIS
WIFE; RAYMOND D. CREED AND MARY CREED, HIS WIFE;
STANLEY J. DROZD AND ROSE DROZD, HIS WIFE; HENRY
J. GROBELNY AND PEARL GROBELNY, HIS WIFE; THAD-
DEUS KASUBINSKI AND AGNES KASUBINSKI, HIS WIFE;
MICHAEL KRUK; STEPHEN KUZMACK AND AMELIA KUZ-
MACK, HIS WIFE; JOHN G. ORSAG AND SUSAN ORSAG, HIS
WIFE; JOHN PLEVA AND ANN PLEVA, HIS WIFE; PAUL
RARUS; STANLEY F. SAKOWSKI AND FLORENCE SAKOW-
SKI, HIS WIFE; BERNARD SCULLY AND MARCELLA SCUL-
LY, HIS WIFE; JOSEPH P. SLEZAK AND JOSEPHINE SLE-
ZAK, HIS WIFE; ARTHUR J. WALCZAK AND CATHERINE
WALCZAK, HIS WIFE; DOUGLAS WHITAKER AND ELEA-
NOR WHITAKER, HIS WIFE; HENRY WONDOWSKY AND
HELEN WONDOWSKY, HIS WIFE; ALBERT F. SZCZEPANIK
AND SOPHIE B. SZCZEPANIK, HIS WIFE; STANLEY GOLEM-
BIESKI, EXECUTOR OF THE ESTATE OF WALTER GOLEM-
BIESKI; AND HENRY V. KOWALESKI AND JANE KOWALE-
SKI (FIRST NAME BEING FICTITIOUS), HIS WIFE, PLAIN-
TIFFS-APPELLANTS, v. JOHNS–MANVILLE PRODUCTS COR-
PORATION; EAGLE-PICHER INDUSTRIES, INC.; MADSEN-
HOWELL, INC.; RAYBESTOS-MANHATTAN, INC.; GAF COR-
PORATION AND UNARCO INDUSTRIES, DEFENDANTS-RE-
SPONDENTS, AND STATE INSULATION CORP., ET AL., DE-
FENDANTS.

———

FRANK J. JARUSEWICZ AND MARY JARUSEWICZ, HIS WIFE;
ROBERT J. RUTKOWSKI AND CAROLINE S. RUTKOWSKI,
HIS WIFE; MICHAEL J. LEONARD AND ALFONSINA J.
LEONARD, HIS WIFE; RUSSELL J. HAHN, AND JEAN HAHN,
HIS WIFE; JERRY E. COVELL AND ALICE COVELL, HIS
WIFE; HENRY J. KELEHER; HARRISON LARSEN; GEORGE
W. OGBORNE AND JOAN OGBORNE, HIS WIFE; STANLEY R.
PIATEK AND GLORIA J. PIATEK, HIS WIFE; MARTIN RO-
SENTHAL AND HELEN ROSENTHAL, HIS WIFE; JOHN

O'BRIEN AND MARIJANE O'BRIEN, HIS WIFE; JOSEPH ZA-KRZEWSKI AND IRENE A. ZAKRZEWSKI, HIS WIFE; ER-NEST C. WEIBRECHT AND GAIL M. WEIBRECHT, HIS WIFE; WILLIAM MADELINE AND CHRISTINE T. MADELINE, HIS WIFE; CARLTON HOLTSLANDER AND JANE D. HOLTSLAN-DER, HIS WIFE; ALEXANDER HARANSKY AND DOROTHY HARANSKY, HIS WIFE; LAWRENCE A. MIZAK AND ANNA H. MIZAK, HIS WIFE; WARREN H. RAPPLEYEA, BY HIS ADMINISTRATRIX AD PROSEQUENDUM, KATHLEEN J. RAPPLEYEA; AND KATHLEEN J. RAPPLEYEA, EXECUTRIX OF THE ESTATE OF WARREN H. RAPPLEYEA, DECEASED, PLAINTIFFS-APPELLANTS, v. JOHNS–MANVILLE PROD-UCTS CORPORATION; A. P. GREEN REFRACTORIES CO.; METROPOLITAN REFRACTORIES, DIVISION OF A. P. GREEN REFRACTORIES CO.; QUIGLEY CO., SUBSIDIARY OF PFIZ-ER, INC.; EAGLE-PICHER INDUSTRIES, INC.; MADSEN & HOWELL, INC.; OWENS-ILLINOIS, INC. AND UNARCO IN-DUSTRIES, INC., DEFENDANTS-RESPONDENTS, AND J. H. FRANCE REFRACTORIES CORP., ET AL., DEFENDANTS.

---

JOHN HANN AND MARY HANN, HIS WIFE; MICHAEL HOMYAK AND MARY HOMYAK, HIS WIFE; STANLEY J. NOWAKOW-SKI AND ANN NOWAKOWSKI, HIS WIFE; DANIEL J. PUN-TILLO AND DOROTHY PUNTILLO, HIS WIFE; JAMES A. THOMAS AND ANNA THOMAS, HIS WIFE; THADEUSZ FAIST AND BARBARA FAIST, HIS WIFE, PLAINTIFFS-AP-PELLANTS, v. JOHNS–MANVILLE SALES CORPORATION; EAGLE-PICHER INDUSTRIES, INC. AND OWENS-ILLINOIS, INC., DEFENDANTS-RESPONDENTS, AND PORTER HAYDEN CO., ET AL., DEFENDANTS.

---

PETER BLAZEWICZ; VINCENT S. DMUCHOWSKI, SR. AND FRANCES DMUCHOWSKI, HIS WIFE; SPASE C. ELICK AND GERALDINE ELICK, HIS WIFE; FRANK R. T. LEE AND TERESA LEE, HIS WIFE; DAVID F. LINDSAY AND JANE LINDSAY, HIS WIFE; ALBERT F. MARRAPODI AND JANE MARRAPODI (FIRST NAME BEING FICTITIOUS), HIS WIFE; SALVATORE J. PALUMBO; NICHOLAS R. SOMMA AND IDA SOMMA, HIS WIFE; JOSEPH R. TROZZO AND JENNIE TROZ-ZO, HIS WIFE; STANLEY S. WINNICKI AND JOSEPHINE WINNICKI, HIS WIFE; JOHN W. BARBER AND IRENE BAR-BER, HIS WIFE; JUSTIN D. FOLLO, SR., AND FLORENCE FOLLO, HIS WIFE; JAMES W. PAPP, AND ANNA PAPP, HIS WIFE, PLAINTIFFS-APPELLANTS, v. JOHNS–MANVILLE

SALES CORPORATION; EAGLE-PICHER INDUSTRIES, INC. AND OWENS-ILLINOIS, INC., DEFENDANTS-RESPONDENTS, AND PORTER HAYDEN CO., ET AL., DEFENDANTS.

DOROTHY BECKWITH, AS ADMINISTRATRIX AND ADMINIS-TRATRIX AD PROSEQUENDUM OF THE ESTATE OF EARL BECKWITH, PLAINTIFF-APPELLANT, v. JOHNS–MANVILLE SALES CORPORATION, SUCCESSOR TO AND IN LIEU OF JOHNS-MANVILLE PRODUCTS CORPORATION; JOHNS-MANVILLE CANADA, INC., FORMERLY KNOWN AS CANADI-AN JOHNS-MANVILLE CO., LTD., CANADIAN JOHNS-MAN-VILLE AMIANTE, LTD., FORMERLY CANADIAN JOHNS-MANVILLE ASBESTOS, LTD., JOHNS-MANVILLE CORPORA-TION, UNARCO INDUSTRIES, FORMERLY KNOWN AS UN-ION ASBESTOS & RUBBER COMPANY; EAGLE-PICHER IN-DUSTRIES, INC., AND OWENS-ILLINOIS, INC., DEFEND-ANTS-RESPONDENTS, AND JOHN DOE CORPORATION, ET AL., DEFENDANTS.

MARY CRILLEY, AS ADMINISTRATRIX OF THE ESTATE OF JAMES CRILLEY, AND MARY CRILLEY, INDIVIDUALLY, PLAINTIFFS-APPELLANTS, v. ARMSTRONG CORK, ET AL., DEFENDANTS, AND EAGLE-PICHER INDUSTRIES, INC.; JOHNS-MANVILLE CORP.; JOHNS-MANVILLE SALES CORP.; JOHNS-MANVILLE PRODUCTS CORP.; OWENS-ILLINOIS, INC. AND RAYBESTOS-MANHATTAN, INC., DEFENDANTS-RESPONDENTS.

Argued April 19, 1982—Decided July 7, 1982.

*Alan M. Darnell* argued the cause for appellants Beshada, et al. (*Wilentz, Goldman & Spitzer,* attorneys; *Alan M. Darnell, Karen Ann Kubulak* and *Christopher M. Placitella,* on brief).

*Bryan D. Garruto* argued the cause for appellant Beckwith (*Heilbrunn, Finkelstein, Heilbrunn, Garruto & Galex,* attorneys).

*Ronald B. Grayzel* argued the cause for appellants Crilley (*Levinson, Conover, Axelrod & Wheaton,* attorneys).

*David R. Gross* argued the cause for respondents Johns-Manville Products Corporation, Johns-Manville Sales Corporation,

successor to and in lieu of Johns-Manville Products Corporation and Johns-Manville Canada, Inc., formerly known as Canadian Johns-Manville Co. Ltd., Canadian Johns-Manville Amiante Ltd., formerly Canadian Johns-Manville Asbestos Ltd., Johns-Manville Corporation (*Budd, Larner, Kent, Gross, Picillo & Rosenbaum*, attorneys; *David J. Novack* and *Sebastian P. Lombardi*, on the brief).

*Kathleen F. Moran* argued the cause for respondent Raybestos-Manhattan, Inc. (*Morgan, Melhuish, Monaghan & Spielvogel*, attorneys).

*Andrew T. Berry* argued the cause for respondent Owens-Illinois, Inc. (*McCarter & English*, attorneys; *Andrew T. Berry* and *Michael A. Tanenbaum*, on the brief).

*Philip V. Lago* submitted a brief on behalf of respondent GAF Corporation (*Hannoch, Weisman, Stern, Besser, Berkowitz & Kinney*, attorneys; *Anthony J. Marchetta*, of counsel).

*William R. Connelly* submitted a brief on behalf of respondent Quigley Co., Inc., subsidiary of Pfizer, Inc. (*Ravin, Davis & Sweet*, attorneys).

*Dennis F. Carey* submitted a brief on behalf of respondent Unarco Industries, Inc., also referred to as Unarco Industries, formerly known as Union Asbestos & Rubber Company (*Dwyer, Connell & Lisbona*, attorneys).

*Peter W. Sachs* submitted a letter in lieu of brief on behalf of respondents A. P. Green Refractories Co. and Metropolitan Refractories, Division of A. P. Green Refractories Co. (*Sachs & Sachs*, attorneys).

*James F. McNaboe* submitted a letter in lieu of brief on behalf of respondent Eagle-Picher Industries, Inc. (*Schwartz and Andolino*, attorneys).

*William J. Gannon* submitted a letter in lieu of brief on behalf of respondent Madsen & Howell, Inc. (*Ryan and Gannon*, attorneys).

*Ronald S. Suss* submitted a brief on behalf of *amicus curiae* Karl Asch, Esq. (*Karl Asch,* attorney; *Ronald S. Suss* and *Karl Asch,* on the brief).

The Opinion of the Court was delivered by

PASHMAN, J.

The sole question here is whether defendants in a product liability case based on strict liability for failure to warn may raise a "state of the art" defense. Defendants assert that the danger of which they failed to warn was undiscovered at the time the product was marketed and that it was undiscoverable given the state of scientific knowledge at that time. The case comes to us on appeal from the trial court's denial of plaintiffs' motion to strike the state-of-the-art defense. For the reasons stated below, we reverse the trial court judgment and strike the defense.

I

These six consolidated cases are personal injury and wrongful death actions brought against manufacturers and distributors of asbestos products. Plaintiffs are workers, or survivors of deceased workers, who claim to have been exposed to asbestos for varying periods of time. They allege that as a result of that exposure they contracted asbestosis (a non-malignant scarring of the lungs), mesothelioma (a rare cancer of the lining of the chest, the pleura, or the lining of the abdomen, the peritoneum) [1] and other asbestos-related illnesses.

These cases involve asbestos exposure dating back perhaps as far as the 1930's. The suits are first arising now because of the long latent period between exposure and the discernible symptoms of asbestosis and mesothelioma. See *Borel v. Fibreboard Paper Products Corporation,* 493 *F.*2d 1076, 1083 (5th Cir. 1973). Plaintiffs have raised a variety of legal theories to support their

[1] *See* Gordy-Gray, 4A *Attorneys' Textbook of Medicine* A 205C.72 (1981).

claims for damages. The important claim, for purposes of this appeal, is strict liability for failure to warn. Prior to the 1960's, defendants' products allegedly contained no warning of their hazardous nature. Defendants respond by asserting the state-of-the-art defense. They allege that no one knew or could have known that asbestos was dangerous when it was marketed.

There is substantial factual dispute about what defendants knew and when they knew it. A trial judge in the Eastern District of Texas, the forum for numerous asbestos-related cases, has concluded that "[k]nowledge of the danger can be attributed to the industry as early as the mid-1930's ...." *Hardy v. Johns-Manville Sales Corp.*, 509 *F.Supp.* 1352, 1355 (E.D.Texas 1981) (footnote omitted). Defendants respond, how-ever, that it was not until the 1960's that the medical profession in the United States recognized that a potential health hazard arose from the use of insulation products containing asbestos. Before that time, according to defendants, the danger from asbestos was believed limited to workers in asbestos textile mills, who were exposed to much higher concentrations of asbes-tos dust than were the workers at other sites, such as shipyards. Defendants claim that it was not discovered until recently that the much smaller concentrations those workers faced were also hazardous.

We need not resolve the factual issues raised. For purposes of plaintiffs' motion to strike the defense, we assume the defendants' version of the facts. The issue is whether the medical community's presumed unawareness of the dangers of asbestos is a defense to plaintiffs' claims.

## II

As noted, this case involves six consolidated cases. *Jaruse-wicz, et al. v. Johns-Manville, et al.* is a suit by eighteen workers who were employed by Jersey Central Power and Light Compa-ny for various periods between 1930 and 1981, all of whom allege that they used asbestos, asbestos products or asbestos

materials in the course of their work. They allege that they were given no warning, handling instructions or safety equipment to protect them from the dangers of asbestos. *Beshada, et al. v. Johns-Manville, et al.* is a suit by twenty-one current or former pipefitters employed at Hercules, Inc. between 1935 and the present, who allege that they worked with and around insulation products containing asbestos. *Blazewicz, et al. v. Johns-Manville, et al.* and *Hann, et al. v. Johns-Manville, et al.* involve respectively twelve and six employees of Research Cottrell, Inc., between 1936 and 1979. Plaintiff in *Beckwith, et al. v. Johns-Manville, et al.* is the widow of an electrician, Earl Beckwith, who was exposed to finished asbestos products during his work. She alleges that her husband's exposure to asbestos caused various illnesses which resulted in his death. Finally, *Crilley v. Cork, et al.* is a wrongful death action by the widow of James Crilley, who died allegedly as a result of occupational exposure to insulation products containing asbestos.

A single trial judge has been specially assigned to hear all asbestos-related litigation in Middlesex County. On September 9, 1981, counsel for plaintiffs in four of the cases [2] filed a Motion for Partial Summary Judgment seeking to strike the state-of-the-art defense. Subsequently, plaintiffs in the other two cases joined the motion.

Plaintiffs based their motion on *Freund v. Cellofilm Properties, Inc.*, 87 *N.J.* 229 (1981), our most recent case concerning product liability. In *Freund*, Justice Handler elaborated the difference between negligence and strict liability in a failure to warn case. He explained that in strict liability cases knowledge of the dangerousness of the product is imputed to defendants. Plaintiff need not prove that defendant knew or should have known of its dangerousness. The only issue is whether the product distributed by defendant was reasonably safe. Plain-

---

[2] Plaintiffs in *Jarusewicz, Beshada, Blazewicz* and *Hann* are represented by the same counsel.

tiffs urge that *Freund* disposed of the state-of-the-art issue. Since defendant's knowledge of the dangers of the product is presumed, it is irrelevant whether the existence of such dangers was scientifically discoverable. Defendants respond that *Freund* imputes to defendants only "existing knowledge, the technical knowledge available at the time of manufacture."

The trial judge denied the motion to strike. Reading *Freund* in conjunction with prior cases, *Suter v. San Angelo Foundry & Machine Company*, 81 *N.J.* 150 (1979) and *Torsiello v. Whitehall Laboratories*, 165 *N.J.Super.* 311 (App.Div.1979), the judge concluded that *Freund* merely created a rebuttable presumption that defendants had knowledge of the dangers of their product. That presumption could be overcome by proof that the knowledge at issue was "unknowable" at the time of manufacture.

Plaintiffs sought leave from the Appellate Division to appeal the trial court's interlocutory order and filed a motion with this Court for direct certification. The Appellate Division denied plaintiffs' motion for leave to appeal. In all but the *Crilley* case, plaintiffs moved before this Court for leave to appeal the Appellate Division order. We granted their motion on February 25, 1982, and subsequently granted plaintiff Crilley's late motion for leave to appeal.

### III

Our inquiry starts with the principles laid down in *Freund v. Cellofilm Properties, Inc., supra, Suter v. San Angelo Foundry & Machine Company, supra,* and *Cepeda v. Cumberland Engineering Company, Inc.,* 76 *N.J.* 152 (1978). In *Suter,* we summarized the principle of strict liability as follows:

> If at the time the seller distributes a product, it is not reasonably fit, suitable and safe for its intended or reasonably foreseeable purposes so that users or others who may be expected to come in contact with the product are injured as a result thereof, then the seller shall be responsible for the ensuing damages. [*Id.* at 169 (footnote omitted)]

The determination of whether a product is "reasonably fit, suitable and safe" depends on a comparison of its risks and its utility (risk-utility equation).

Central to this theory is the risk-utility equation for determining liability. The theory is that only safe products should be marketed—a safe product being one whose utility outweighs its inherent risk, provided that risk has been reduced to the greatest extent possible consistent with the product's continued utility. [*Freund*, 87 *N.J.* at 238, n.1]

In *Cepeda*, we explained that in the context of design defect liability, strict liability is identical to liability for negligence, with one important caveat: "The only qualification is as to the requisite of foreseeability by the manufacturer of the dangerous propensity of the chattel manifested at the trial—this being imputed to the manufacturer." *Cepeda*, 76 *N.J.* at 172. *See Freund v. Cellofilm Properties, Inc.*, 87 *N.J.* at 239. In so holding, we adopted the explication of strict liability offered by Dean Wade:

The time has now come to be forthright in using a tort way of thinking and tort terminology [in cases of strict liability in tort]. There are several ways of doing it, and it is not difficult. The simplest and easiest way, it would seem, is to assume that the defendant knew of the dangerous condition of the product and ask whether he was then negligent in putting it on the market or supplying it to someone else. In other words, the scienter is supplied as a matter of law, and there is no need for the plaintiff to prove its existence as a matter of fact. Once given this notice of the dangerous condition of the chattel, the question then becomes whether the defendant was negligent to people who might be harmed by that condition if they came into contact with it or were in the vicinity of it. Another way of saying this is to ask whether the magnitude of the risk created by the dangerous condition of the product was outweighed by the social utility attained by putting it out in this fashion. [Wade, "On the Nature of Strict Tort Liability for Products," 44 *Miss.L.J.* 825, 834–35 (1973), quoted in *Cepeda*, 76 *N.J.* at 172]

Stated differently, negligence is conduct-oriented, asking whether defendant's actions were reasonable; strict liability is product-oriented, asking whether the product was reasonably safe for its foreseeable purposes. *Freund*, 87 *N.J.* at 238.[3]

---

[3]The imputation of knowledge is, of course, a legal fiction. It is another way of saying that for purposes of strict liability the defendant's knowledge of the danger is irrelevant. *See Freund v. Cellofilm Products, Inc.*, 87 *N.J.* at 239, quoting Keeton, "Products Liability—Inadequacy of Information," 48 *Tex.L.Rev.* 398, 407–08 (1970). The imputation of knowledge does not represent any presumption that defendants knew or even that they could have known of the product's dangers.

"Warning" cases constitute one category of strict liability cases. Their relation to the strict liability principles set forth above can best be analyzed by focusing on the definition of safe products found in footnote 1 of *Freund. See supra* at 200. For purposes of analysis, we can distinguish two tests for determining whether a product is safe: (1) does its utility outweigh its risk? and (2) if so, has that risk been reduced to the greatest extent possible consistent with the product's utility? *Id.* at 238, n. 1. The first question looks to the product as it was in fact marketed. If that product caused more harm than good, it was not reasonably fit for its intended purposes. We can therefore impose strict liability for the injuries it caused without having to determine whether it could have been rendered safer. The second aspect of strict liability, however, requires that the risk from the product be reduced to the greatest extent possible without hindering its utility. Whether or not the product passes the initial risk-utility test, it is not reasonably safe if the same product could have been made or marketed more safely.[4]

Warning cases are of this second type.[5] When plaintiffs urge that a product is hazardous because it lacks a warning, they typically look to the second test, saying in effect that regardless

---

[4]This dichotomy is created only for purposes of analysis, because it will help explain the role of state-of-the-art in strict liability cases. In actuality, the only test for product safety is whether the benefit outweighs the risk. However, in calculating the benefit from any product, one must consider alternate products that can yield the same benefit at lower risk. Wade, 44 *Miss.L.J.* at 837–38.

[5]This two-part distinction can best be clarified by looking at how it would apply to automobiles without seatbelts. Because of the great utility of cars, few would dispute that even without seatbelts, a car's utility to society outweighs its risks. Thus, cars would be considered safe under the first aspect of the test. However, since seatbelts make cars safer without hindering utility, cars without seatbelts are deemed unsafe by virtue of the second part of the *Freund* test. Warnings are like seatbelts: regardless of the utility and risk of a product without warnings, a warning can generally be added without diminishing utility. *Freund v. Cellofilm Properties, Inc.*, 87 *N.J.* at 238–39, n. 1.

of the overall cost-benefit calculation the product is unsafe because a warning could make it safer at virtually no added cost and without limiting its utility. *Freund* recognized this, noting that in cases alleging "an inadequate warning as to safe use, the utility of the product, as counter-balanced against the risks of its use, is rarely at issue." *Id.* at 242.

*Freund* is our leading case on strict liability for failure to warn. In *Freund*, Justice Handler applied the principles set forth above, initially laid down in *Suter* and *Cepeda*, to warning cases. The issue there was whether there is any difference between negligence and strict liability in warning cases. We stated unequivocally that there is. That difference is the same difference that we noted in *Suter* and *Cepeda* concerning other design defect cases:

> when a plaintiff sues under strict liability, there is no need to prove that the manufacturer knew or should have known of any dangerous propensities of its product—such knowledge is imputed to the manufacturer. [*Freund v. Cellofilm Properties, Inc.,* 87 *N.J.* at 239]

Thus, we held in *Freund* that it was reversible error for the trial judge to instruct the jury only with a negligence charge.

With these basic principles of design defect strict liability in New Jersey as our framework for analysis, we turn now to a discussion of the state-of-the-art defense.

## IV

As it relates to warning cases, the state-of-the-art defense asserts that distributors of products can be held liable only for injuries resulting from dangers that were scientifically discoverable at the time the product was distributed. Defendants argue that the question of whether the product can be made safer must be limited to consideration of the available technology at the time the product was distributed. Liability would be absolute, defendants argue, if it could be imposed on the basis of a subsequently discovered means to make the product safer since technology will always be developing new ways to make products safer. Such a rule, they assert, would make manufacturers

liabile whenever their products cause harm, whether or not they are reasonably fit for their foreseeable purposes.

Defendants conceptualize the scientific unknowability of the dangerous propensities of a product as a technological barrier to making the product safer by providing warnings. Thus, a warning was not "possible" within the meaning of the *Freund* requirement that risk be reduced "to the greatest extent possible."

In urging this position, defendants must somehow distinguish the *Freund* holding that knowledge of the dangers of the product is imputed to defendants as a matter of law. A state-of-the-art defense would contravene that by requiring plaintiffs to prove at least that knowledge of the dangers was scientifically available at the time of manufacture.

Defendants argue that *Freund* did not specify precisely what knowledge is imputed to defendants. They construe *Freund* to impute only that degree of knowledge of the product's dangerousness that existed at the time of manufacture or distribution.[6]

---

[6]Defendants seek support in this regard from the following passage in *Suter*:

> Depending upon the proofs, some factors which may be considered by the jury in deciding the reasonableness of the manufacturer's conduct include the technological feasibility of manufacturing a product whose design would have prevented or avoided the accident, given the known state of the art; and the likelihood that the product will cause injury and the probable seriousness of the injury. We observe in passing that the state of the art refers not only to the common practice and standards in the industry but also to other design alternatives within practical and technological limitations at the time of distribution. [81 *N.J.* 171–72 (citation omitted)]

Defendants argue on the basis of this passage that *Suter* has explicitly accepted the state-of-the-art defense, and that *Freund* should be construed to be consistent with that reading of *Suter*.

We note, first, that this passage in *Suter* is dictum. *Suter* did not involve a state-of-the-art defense. The situation addressed in the case is not one in which the state of the art has improved between the time the product was distributed and the time of trial. Second, *Suter*, unlike *Freund* and this case, was not a warning case. The passage from *Suter* suggests only that

■ While we agree that *Freund* did not explicitly address this question, the principles laid down in *Freund* and our prior cases contradict defendants' position. Essentially, state-of-the-art is a negligence defense. It seeks to explain why defendants are not culpable for failing to provide a warning. They assert, in effect, that because they could not have known the product was dangerous, they acted reasonably in marketing it without a warning. But in strict liability cases, culpability is irrelevant. The product was unsafe. That it was unsafe because of the state of technology does not change the fact that it was unsafe. Strict liability focuses on the product, not the fault of the manufacturer. "If the conduct is unreasonably dangerous, then there should be strict liability without reference to what excuse defendant might give for being unaware of the danger." Keeton, 48 *Tex.L.Rev.* at 408.

When the defendants argue that it is unreasonable to impose a duty on them to warn of the unknowable, they misconstrue both the purpose and effect of strict liability. By imposing strict liability, we are not requiring defendants to have done something that is impossible. In this sense, the phrase "duty to warn" is misleading. It implies negligence concepts with their attendant focus on the reasonableness of defendant's behavior. However, a major concern of strict liability—ignored by defendants—is the conclusion that if a product was in fact defective, the distributor of the product should compensate its victims for the misfortune that it inflicted on them.

state-of-the-art may be relevant to a safety device case, such as the seatbelt case discussed at n. 3 above.

We hold in this case that a state-of-the-art defense should not be allowed in failure to warn cases. There are strong conceptual similarities between warning and safety device cases. *See* n.3 above. Thus, the reasoning applied here may be equally applicable to cases involving failure to include appropriate safety devices in products. However, there may be distinctions between the two situations. We specifically decline to address whether a state-of-the-art defense is appropriate to safety device cases.

If we accepted defendants' argument, we would create a distinction among fact situations that defies common sense. Under the defendants' reading of *Freund*, defendant would be liable for failure to warn if the danger was knowable even if defendants were not negligent in failing to discover it. Defendants would suffer no liability, however, if the danger was undiscoverable. But, as Dean Keeton explains,

if a defendant is to be held liable for a risk that is discoverable by some genius but beyond the defendant's capacity to do so, why should he not also be liable for a risk that was just as great but was not discoverable by anyone? [Keeton, 48 *Tex.L.Rev.* at 409]

We are buttressed in our conclusion that the state-of-the-art defense is inconsistent with *Freund* by the recent decision of Judge Ackerman in *Marcucci v. Johns-Manville Sales Corp.*, Nos. 76–414, 76–604 and 76–1510 (D.N.J. Feb. 19, 1982), in which he applied New Jersey law to strike defendants' state-of-the-art-defense.

The most important inquiry, however, is whether imposition of liability for failure to warn of dangers which were undiscoverable at the time of manufacture will advance the goals and policies sought to be achieved by our strict liability rules. We believe that it will.

*Risk Spreading.* One of the most important arguments generally advanced for imposing strict liability is that the manufacturers and distributors of defective products can best allocate the costs of the injuries resulting from those products. The premise is that the price of a product should reflect all of its costs, including the cost of injuries caused by the product. This can best be accomplished by imposing liability on the manufacturer and distributors. Those persons can insure against liability and incorporate the cost of the insurance in the price of the product. In this way, the costs of the product will be borne by those who profit from it: the manufacturers and distributors who profit from its sale and the buyers who profit from its use. "It should be a cost of doing business that in the course of doing that business an unreasonable risk was created." Keeton, 48 *Tex.L.Rev.* at 408. *See* Prosser, *The Law of Torts*, § 75, p. 495 (4th Ed. 1971).

Defendants argue that this policy is not forwarded by imposition of liability for unknowable hazards. Since such hazards by definition are not predicted, the price of the hazardous product will not be adjusted to reflect the costs of the injuries it will produce. Rather, defendants state, the cost "will be borne by the public at large and reflected in a general, across the board increase in premiums to compensate for unanticipated risks." There is some truth in this assertion, but it is not a bad result.

First, the same argument can be made as to hazards which are deemed scientifically knowable but of which the manufacturers are unaware. Yet it is well established under our tort law that strict liability is imposed even for defects which were unknown to the manufacturer. It is precisely the imputation of knowledge to the defendant that distinguishes strict liability from negligence. *Freund*, 87 *N.J.* at 240. Defendants advance no argument as to why risk spreading works better for unknown risks than for unknowable risks.

Second, spreading the costs of injuries among all those who produce, distribute and purchase manufactured products is far preferable to imposing it on the innocent victims who suffer illnesses and disability from defective products. This basic normative premise is at the center of our strict liability rules. It is unchanged by the state of scientific knowledge at the time of manufacture.

Finally, contrary to defendants' assertion, this rule will not cause the price and production level of manufactured products to diverge from the so-called economically efficient level. Rather, the rule will force the price of any particular product to reflect the cost of insuring against the possibility that the product will turn out to be defective.

*Accident Avoidance.* In *Suter*, we stated:

Strict liability in a sense is but an attempt to minimize the costs of accidents and to consider who should bear those costs. *See* the discussion in Calabresi & Hirschoff, 'Toward a Test for Strict Liability in Torts,' 81 *Yale L.J.* 1055 (1972), in which the authors suggest that the strict liability issue is to decide which party is the 'cheapest cost avoider' or who is in the best position to make the

cost-benefit analysis between accident costs and accident avoidance costs and to act on that decision once it is made. *Id.* at 1060. Using this approach, it is obvious that the manufacturer rather than the factory employee is 'in the better position both to judge whether avoidance costs would exceed foreseeable accident costs and to act on that judgment.' *Id.* [*Suter v. San Angelo Foundry*, 81 *N.J.* at 173–74]

Defendants urge that this argument has no force as to hazards which by definition were undiscoverable. Defendants have treated the level of technological knowledge at a given time as an independent variable not affected by defendants' conduct. But this view ignores the important role of industry in product safety research. The "state-of-the-art" at a given time is partly determined by how much industry invests in safety research. By imposing on manufacturers the costs of failure to discover hazards, we create an incentive for them to invest more actively in safety research.

*Fact finding process.* The analysis thus far has assumed that it is possible to define what constitutes "undiscoverable" knowledge and that it will be reasonably possible to determine what knowledge was technologically discoverable at a given time. In fact, both assumptions are highly questionable. The vast confusion that is virtually certain to arise from any attempt to deal in a trial setting with the concept of scientific knowability constitutes a strong reason for avoiding the concept altogether by striking the state-of-the-art defense.

Scientific knowability, as we understand it, refers not to what in fact was known at the time, but to what *could have been* known at the time. In other words, even if no scientist had actually formed the belief that asbestos was dangerous, the hazards would be deemed "knowable" if a scientist could have formed that belief by applying research or performing tests that were available at the time. Proof of what could have been known will inevitably be complicated, costly, confusing and time-consuming. Each side will have to produce experts in the history of science and technology to speculate as to what knowledge was feasible in a given year. We doubt that juries will be capable of even understanding the concept of scientific knowa-

bility, much less be able to resolve such a complex issue. Moreover, we should resist legal rules that will so greatly add to the costs both sides incur in trying a case.

The concept of knowability is complicated further by the fact, noted above, that the level of investment in safety research by manufacturers is one determinant of the state-of-the-art at any given time. Fairness suggests that manufacturers not be excused from liability because their prior inadequate investment in safety rendered the hazards of their product unknowable. Thus, a judgment will have to be made as to whether defendants' investment in safety research in the years preceding distribution of the product was adequate. If not, the experts in the history of technology will have to testify as to what would have been knowable at the time of distribution if manufacturers had spent the proper amount on safety in prior years. To state the issue is to fully understand the great difficulties it would engender in a courtroom.

In addition, discussion of state-of-the-art could easily confuse juries into believing that blameworthiness is at issue. Juries might mistakenly translate the confused concept of state-of-the-art into the simple question of whether it was defendants' fault that they did not know of the hazards of asbestos. But that would be negligence, not strict liability.

For precisely this reason, Professor Keeton has urged that negligence concepts be carefully avoided in strict liability cases.

My principal thesis is and has been that theories of negligence should be avoided altogether in the products liability area in order to simplify the law, and that if the sale of a product is made under circumstances that would subject someone to an unreasonable risk of harm in fact, liability for harm resulting from those risks should follow. [Keeton, 48 *Tex.L.Rev.* at 409 (footnote omitted)]

This Court has expressed the same concern in *Freund*, reversing the trial court's jury charge because the "terminology employed by the trial judge was riddled with references to negligence, knowledge and reasonable care on the part of a manufacturer." 87 *N.J.* at 243. "[W]e must be concerned with the effect of the trial judge's articulation upon the jury's deliberative processes." *Id.* at 244.

## V

For the reasons expressed above, we conclude that plaintiffs' position is consistent with our holding in *Freund* and prior cases and will achieve the various policies underlying strict liability. The burden of illness from dangerous products such as asbestos should be placed upon those who profit from its production and, more generally, upon society at large, which reaps the benefits of the various products our economy manufactures. That burden should not be imposed exclusively on the innocent victim. Although victims must in any case suffer the pain involved, they should be spared the burdensome financial consequences of unfit products. At the same time, we believe this position will serve the salutary goals of increasing product safety research and simplifying tort trials.

Defendants have argued that it is unreasonable to impose a duty on them to warn of the unknowable. Failure to warn of a risk which one could not have known existed is not unreasonable conduct. But this argument is based on negligence principles. We are not saying what defendants should have done. That is negligence. We are saying that defendants' products were not reasonably safe because they did not have a warning. Without a warning, users of the product were unaware of its hazards and could not protect themselves from injury. We impose strict liability because it is unfair for the distributors of a defective product not to compensate its victims. As between those innocent victims and the distributors, it is the distributors—and the public which consumes their products—which should bear the unforeseen costs of the product.

The judgment of the trial court is reversed; the plaintiff's motion to strike the state-of-the-art defense is granted.

*For reversal*—Justices PASHMAN, HANDLER, POLLOCK, O'HERN and SULLIVAN, and Judge MATTHEWS—6.

*For affirmance*—None.