Antonio CIPOLLONE, individually and as executor of the Estate of Rose D. Cipollone, Plaintiff,

v.

LIGGETT GROUP, INC., a Delaware Corporation; Philip Morris, Incorporated, a Virginia Corporation; and Loew's Theatres, Inc., a New York Corporation, Defendants.

Civ. A. No. 83–2864.

United States District Court, D. New Jersey.

Sept. 25, 1986.

---

**10.** *See* Grievance Form and Record of Proceedings.

**11.** Plaintiff's Motion for Summary Judgment as to Count I at 9.

Raymond F. Dryzdowski, Westmont (Brown, Connery, Kulp, Wille, Purnell & Greene), for defendant Philip Morris Inc.

Marc Z. Edell, Short Hills (Budd Larner Gross Picillo Rosenbaum & Sade), for plaintiff.

## OPINION

SAROKIN, District Judge.

In this diversity action plaintiff Antonio Cipollone, acting individually and as the administrator of his deceased wife's estate, seeks damages against the companies that manufactured and sold cigarettes which he alleges to be the proximate cause of her lung cancer and death. At this juncture, plaintiff moves in *limine* for an order precluding the defendants from introducing evidence as to the cigarette industry's collateral benefits to the economy as part of their defense to those of his strict liability claims which are premised on "risk/utility" theory. Having examined the judicial precedent and scholarly commentary defining the scope, purpose and operation of risk/utility theory, the court concludes that plaintiffs are entirely correct and that all such collateral benefit evidence should be ordered excluded as an inappropriate consideration under risk/utility analysis.

## BACKGROUND

Rose and Antonio Cipollone filed this complaint on August 1, 1983 against defendants Liggett Group, Inc., Philip Morris, Inc., and Loew's Inc., alleging that Rose Cipollone had developed lung cancer as a proximate result of her use of defendants' products over a period of approximately forty years. On May 31, 1985, Antonio Cipollone filed a third amended complaint reflecting the fact that Rose Cipollone had died as a result of the cancer that had given rise to this suit.

The instant motion relates to the evidence which the parties plan to introduce with regard to plaintiff's strict liability claims. In September of 1983 plaintiff served a First Set of Interrogatories on the defendants, two of which were directed to the "risk/utility" issues which is a significant aspect of New Jersey strict liability law. Those interrogatories, and defendant

Liggett Group's supplemental answers, state in relevant part as follows:

INTERROGATORY NO. 48: Do you contend that the cigarettes which you manufacture have social utility? If so, set forth:

(a) a full and detailed description of the factual basis for this contention ...

INTERROGATORY NO. 49: If your answer to the foregoing interrogatory is in the affirmative, state whether you contend that the social utility of the cigarettes which you manufacture outweighs the health risks associated with the smoking of these cigarettes. If so, set forth:

(a) a full and detailed description of the factual basis for this contention.....

*Supplemental Answer:* Without agreeing that application of a risk/utility test is appropriate in this case, Liggett states as follows: The chief component of the social utility of cigarettes is the enjoyment that they provide the millions of individuals in this country who have chosen to smoke. Cigarette smoking was a popular practice long before the advent of the cigarette industry. The cigarette manufacturers came into existence to satisfy the preexisting demand for cigarettes.

Liggett is unaware of any study which has sought to place some numerical value, whether a dollar figure or otherwise, upon the total enjoyment experienced as a result of smoking by those who have chosen to smoke. Although this "societal enjoyment" may defy precise measurement, its existence in a society where so many have chosen to smoke for so many years is irrefutable.

The cigarette industry is a major contributor to the nation's economy. The industry provides thousands of jobs in manufacturing and in sales. Moreover, thousands of farm families derive their livelihood from their tobacco crop. Cigarettes are an important export and as such have a favorable impact upon the nation's balance of trade. And, of course, the industry contributes substantially to the public fisc by way of its payment of federal, state and local taxes.

The Congress of the United States has determined that it is legal to manufacture and sell cigarettes. In so doing, Congress has determined not only that cigarettes have social utility, but has concluded that their social utility exceeds any costs associated with their use. In the Congressional deliberations that led to passage of the Federal Cigarette Labelling and Advertising Act (1965), as amended by the Public Health Cigarette Smoking Act of 1969, 15 U.S.C. §§ 1331, 1340, prohibition of the sale of cigarettes was considered. Congress opted instead to allow their sale—and to prevent the destruction of the tobacco industry—as long as consumers were given the prescribed warning. Liggett contends that the Act evinces a Congressional determination (1) that cigarettes have social utility; (2) that the social utility of cigarettes sold with the prescribed warning on the package outweighs any risk associated with such cigarettes; and (3) that ultimately only the individual can make the risk/utility analysis since the decision whether or not to smoke is a personal one.

Each individual makes that personal cost-utility determination when he chooses to smoke. As an example, Mrs. Cipollone smoked cigarettes because she enjoyed them. Moreover, Mrs. Cipollone made her decision with full knowledge of the reports purporting to show that cigarette smoking caused various adverse health effects, which information had been a matter of common knowledge years before the Surgeon General's Committee issued its report in 1964....

(Defendant Liggett Group, Inc.'s Second Supplemental Answers to Plaintiff's Interrogatories).

Plaintiff now moves to preclude the defendants from attempting to introduce any and all evidence as to the social benefits that flow from the production of cigarettes, as opposed to their consumption, as a factor to be considered in the risk/utility

analysis. Defendants respond first that the motion is premature, and second that even if not premature it should be denied because risk/utility analysis permits them to introduce evidence relating to every kind of social benefit that stems from their product in order to rebut plaintiffs' claims as to the secondary social harms that result from cigarette use.

DISCUSSION

Before proceeding to the merits, the court addresses, and rejects, the defendants' argument that this motion is premature. Defendants claim first that disposition of the issue should await a later stage when they shall bring a motion challenging the validity of the plaintiff's "novel" attempt to use risk/utility theory to challenge the very marketing of a product, rather than the failure to employ an alternative available design. Secondly, defendants argue more generally that, as a discretionary matter, motions *in limine* should be ruled on only after the close of discovery and the completion of pretrial proceedings. "Even then," defendants argue, "such a motion is an inappropriate tool for the resolution of evidentiary issues when the record is inadequate, when the issue addressed by the motion may not even arise at trial, or when it would result in a burdensome and piecemeal resolution of the issues." (Def. br., p. 5).

■ As for defendants' first argument, notwithstanding their attempts to protray plaintiff's risk/utility claim as so unusual as to require intensive inspection at some later date, the court fails to be persuaded that this is so. In fact, the New Jersey Supreme Court stated quite straightforwardly in *O'Brien v. Muskin Corp.*, 94 N.J. 169, 184, 463 A.2d 298 (1983) that, "[Certain] products, including some for which no alternative exists, are so dangerous and of such little use that under the risk-utility analysis, a manufacturer would bear the cost of liability of harm to others," and that, "That cost might dissuade a manufacturer from placing the product on the market, even if the product has been made as safely as possible." In challenging the reasonableness of defendants' very decision to market cigarettes (regardless of whether a safer design might have been possible) the plaintiff therefore stands on firm legal ground. It would consequently accomplish little to postpone adjudication of the instant matter in order to afford defendants an opportunity to assert this argument that plaintiff's theory of the case is fatally flawed.

■ Regarding defendants' second ground for postponement, their cautionary arguments are well taken. It is of course true that admissibility issues should not be decided when further development of the facts of a case might shed some light on their merits. *Sperberg v. Goodyear Tire & Rubber Co.*, 519 F.2d 708, 712 (6th Cir. 1973). Furthermore, a court may properly exercise its discretion so as to refrain from deciding a motion *in limine* when it appears that such decision will have little effect on the proofs or the parties' pretrial preparation. At the same time, however, it is hardly the case that motions *in limine* are such that there exists any conclusive presumption against their prompt disposition. Rather, as with most any other aspect of the litigation process, the propriety of considering such a motion at any particular stage depends on the particular situation at hand. *See* 21 C. Wright & K. Graham, Federal Practice & Procedure § 5037, at 195 (1977). In this case, the concerns expressed by defendants are simply inapposite. The plaintiff's motion requests decision of an issue whose nature has been made quite clear by virtue of the discovery already had. Furthermore, the matter is a question of law whose disposition will be unaffected by future factual developments. To postpone decision will therefore produce no cognizable benefit. Failure to decide the issue, on the other hand, will require both parties to continue to conduct discovery on the assumption that the evidence in question may be admissible. So operating, they will have to devote large amounts of resources to hiring experts to develop detailed evaluations of the economic benefits—or the lack thereof—that this society

derives from the production and sale of cigarettes. In sum, concern for the prompt and economical progression of this litigation counsels in favor of, rather than against, immediate disposition of plaintiff's motion.

■ The court turns, then, to the merits. The basis for plaintiff's motion *in limine* is that the societal benefits that result from producing and marketing a product are simply irrelevant to risk/utility analysis. Defendants argue to the contrary, claiming that such benefits are as integral to a fair evaluation of a product's value to society as are those attendant to the product's use. While resolution of this issue is largely preordained by the basic theoretical underpinnings of strict liability generally, *see, e.g.,* Wade, *On the Nature of Strict Liability for Products,* 44 Miss.L.J., 825 (1973), Keeton, *The Meaning of Defect in Products Liability Law—A Review of Basic Principles,* 45 Mo.L.Rev. 579 (1980), the court must look to the pronouncements of the New Jersey Supreme Court in order to frame the issue and advance its resolution in this diversity case.

In recent years, the New Jersey Supreme Court has devoted much attention to the issue of strict liability. *See, e.g., Feldman v. Lederle Laboratories,* 97 N.J. 429, 479 A.2d 374 (1984); *O'Brien v. Muskin Corp.,* 94 N.J. 169, 463 A.2d 298 (1983); *Beshada v. Johns-Manville Prods. Corp.,* 90 N.J. 191, 447 A.2d 539 (1982); *Freund v. Cellofilm Properties, Inc.,* 87 N.J. 229, 432 A.2d 925 (1981); *Suter v. San Angelo Foundry & Machine Co.,* 81 N.J. 150, 406 A.2d 140 (1979); *Cepeda v. Cumberland Engineering Co.,* 76 N.J. 152, 386 A.2d 816 (1978). Drawing on its own substantial precedent, the court stated in *Feldman* that, "We commence our strict liability analysis with the now familiar refrain that to establish strict liability a plaintiff must prove that the product was defective, that the defect existed when the product left the defendant's control, and that the defect caused injury to a reasonably foreseeable consumer.... The defect may take one of three forms: a manufacturing flaw, a design defect, or an inadequate warning." *Id.* 97 N.J. at 449, 479 A.2d 374. Proceeding then to define the meaning of "defect" in improper design and warning cases, the court noted that, "The question ... is whether, assuming that the manufacturer knew of the defect in the product, he acted in a reasonably prudent manner in marketing the product or in providing the warnings given." *Id.* at 451, 479 A.2d 374. The court had already discussed this "reasonableness" standard a year earlier in *O'Brien,* where it explained that it may be based on either "a comparison of the utility of the product with the risk of injury that it poses to the public", *id.* 94 N.J. at 181, 463 A.2d 298, or on "the consumer expectations test, which recognizes that the failure of the product to perform safely may be viewed as a violation of the reasonable expectations of the consumer," *id.* at 182, 463 A.2d 298. *See Whitehead v. St. Joe Lead Co.,* 729 F.2d 238, 244 (3d Cir.1984).

Here, plaintiff alleges that defendants' products fail to meet the former, that is, the "risk/utility" standard. This particular aspect of risk/utility theory has itself been given considered attention by the New Jersey Supreme Court. In *Cepeda,* for example, the court adopted the seven factors outlined by Dean Wade as relevant to the determination of whether a product's risk outweighs its utility.[1] The court further

---

**1.** The seven factors, as described in *Cepeda,* are as follows:

    (1) The usefulness and desirability of the product—its utility to the user and to the public as a whole.

    (2) The safety aspects of the product—the likelihood that it will cause injury, and the probable seriousness of the injury.

    (3) the availability of a substitute product which would meet the same need and not be as unsafe.

    (4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility.

    (5) The user's ability to avoid danger by the exercise of care in the use of the product.

    (6) The user's anticipated awareness of the dangers inherent in the product and their avoidability, because of general public knowledge of the obvious condition of the product,

elucidated the standard in *O'Brien*, where it made clear by the following language that the inquiry is essentially a balancing test in which numerous factors may appropriately be considered in arriving at a conclusion as to a product's utility.

The assessment of the utility of a design involves the consideration of available alternatives. If no alternatives are available, recourse to a unique design is more defensible. The existence of a safer and equally efficacious design, however, diminishes the justification of using a challenged design.

The evaluation of the utility of a product also involves the relative need for that product; some products are essentials, while others are luxuries. A product that fills a critical need and can be designed in only one way should be viewed differently from a luxury item. Still other products, including some for which no alternative exists, are so dangerous and of such little use that under the risk-utility analysis, a manufacturer would bear the cost of liability of harm to others. That cost might dissuade a manufacturer from placing the product on the market, even if the product has been made as safely as possible.

*O'Brien*, 94 N.J. at 184, 463 *A*.2d 298. These passages further suggest, however, that although the risk/utility analysis mandated by the New Jersey Supreme Court may be far-reaching, its focus remains solely on the usefulness of, and dangers inherent in, the product. For while it is true that the "reasonableness" of the manufacturer will in the end be relevant to a determination of whether the product should have been placed on the market, such "reasonableness" is determined by looking only to the social benefits of a product, as opposed to its production. Notwithstanding defendants' attempts to extract such a meaning by means of selective citation,[2] the New Jersey Supreme Court's decisions have never said that a product's utility may be established by looking to whether the defendant "reasonably" believed that its profits would be sufficient to maintain a livelihood, hire employees, or pay taxes by operating the company that placed a product on the market.

The New Jersey Supreme Court's silence in this regard becomes all the more deafening upon an inspection of the principles underlying strict liability theory. Defendants' proposed evidence, when distilled to its essence, aims to establish that their product is profitable, that some of those profits are disseminated to others in society, and that such benefits would be reduced or eliminated if liability were imposed. But strict liability law is, if anything, intended to temper the profit motive by making a manufacturer or marketer aware that it may be less costly in the long run to market a product more safely, or not to market it at all. *See* Holford, *The Limits of Strict Liability for Product Design and Manufacture*, 52 Tex.L.Rev. 81, 86 (1973). As noted by Dean Wade, "Manufacturers are frankly in the business of making and selling products for the profit involved." Wade, *On Product Design Defects and their Actionability*, 33 Vand.L.Rev. 551, 569 (1980). To permit defendants to introduce the evidence that they here propose would undercut the very goals of strict liability law insofar as it suggests that defendants' interest in making a profit could transform an otherwise insufficient evaluation of their product's safety into a reasonable one.

or of the existence of suitable warnings or instructions.
(7) The feasibility, on the part of the manufacturer, of spreading the loss be setting the price of the product or carrying liability insurance.
*Cepeda*, 76 N.J. at 174, 386 A.2d 816, *citing* Wade, 44 Miss.L.J. at 837–38.

**2.** In particular, defendants cite the court to *Cepeda*, 76 N.J. at 173, 386 A.2d 816, which notes that the first of Dean Wade's factors is "utility ... to the public as a whole," to *Suter's* citation of Dean Green for the proposition that "the economic good of the group" is relevant to a determination of liability, and to Comment a to Section 292 of the Restatement. A fair reading of these sources establishes, however, that they all mean to refer to the general social benefits that result from use of the product, rather than its production.

Secondly, a fundamental purpose behind the imposition of strict liability is to require that a product "pay its way" by compensating for the harms it causes. *See Beshada v. Johns-Manville Products Corp.*, 90 N.J. 191, 207, 447 A.2d 539 (1982); Traynor, *The Ways and Meanings of Defective Products and Strict Liability*, 32 Tenn.L.Rev. 363, 366 (1965); Holford, *supra*, at 86. For this purpose to be furthered it is of course necessary to accept that a product's profitability will be reduced as it bears the costs attendant to its use, and indeed that its true costs to society may so outweigh its usefulness that those costs, when reflected in the product's price, will ultimately lead to that product's withdrawal from the market. That some economic dislocation may thereby result in the short run is, in turn, an accepted fact of life in the operation of a free market system in which those entities who profit from the marketing of a product—rather than its individual victims, or the government, or society—are the ones who are expected to bear the risks that such products are not economically viable. Indeed, any avoidance of product liability for reasons unrelated to the inherent value of the product itself would permit the continued marketing of products that do not truly pay their way, thus discouraging the profiting entities from devoting their energies to making their product safer, or to producing products that are more socially beneficial in the long term. To permit a manufacturer or marketer to introduce evidence of a product's profitability, and to suggest that such profitability will be endangered if legal liability is found, would thus undermine these goals of greater overall economic efficiency and product safety. Wholehearted adoption of strict liability theory does not appear to have given the New Jersey Supreme Court any pause whatsoever, *see O'Brien*, 94 N.J. at 182, 463 A.2d 298; *Beshada*, 90 N.J. at 205, 447 A.2d 539, nor have defendants identified any opinion by which that court has expressed substantial hesitancy as to these or any other of the theory's broader economic implications.

Finally, defendants argue that a tort theory which might potentially price cigarettes out of the market would contravene Congress' intention in the Cigarette Labelling and Advertising Act, 15 U.S.C. §§ 1331–1340 (1982). As this court has noted in its opinion of September 20, 1986, and as has been confirmed by the Third Circuit, *Cipollone v. Liggett Group, Inc.*, 789 F.2d 181, 185 (3d Cir.1986), the Act does not expressly preempt all state common law claims, but rather only those which directly impinge on the use of warning labels or advertising. Furthermore, while it may be the case that the legislative branch has formulated some policies which favor the cigarette industry, defendants have identified no other provision in the federal law which so favors that industry that it directly prohibit states from enforcing those laws which protect the health and safety of their citizens in any way which might affect the profitability of cigarette sales. This court cannot, therefore, conclude that federal law affords defendants an automatic right to undermine plaintiff's state law claim with evidence that would otherwise constitute an irrelevant defense.

In any event, viewing the matter from a more practical perspective, it is by no means clear that a finding of liability in this case, should it occur, would spell the end of cigarette sales. For it is also possible under an efficient risk-spreading system that the price of defendants' product will rise to a level that will both be accepted by the many who consume that commodity, and reflect the costs of compensating those who are harmed by it. *See* Holford, *supra* at 86, *Beshada v. Johns-Manville Products Corp.*, 90 N.J. 191, 205, 447 A.2d 539 (1982). Thus the state's interest in risk spreading may well coexist quite harmoniously with any federal policy that may favor the cigarette industry.

CONCLUSION

In essence, defendants argue that in determining liability, a jury engaged in the risk utility analysis may take into consideration profits made, employees hired, benefits to suppliers of goods and services, tax-

es generated and even charitable activities or contributions made by the defendant manufacturer. The analysis was never meant to balance the risk to the consumer against the general benefit to society. Rather, the sole question presented is whether the risk to the consumers exceeds the utility to those consumers. The manufacturer of a highly dangerous or defective product with no or limited utility to a consumer, should not escape liability by demonstrating that the manufacturer of the product makes money for stockholders, for workers, for contractors, for suppliers, for municipalities, for the IRS, etc. It is the benefit and utility to the cigarette smoker which is here in issue, and not the benefit to the cigarette industry or those in turn, who benefit from its existence.

Plaintiff's motion *in limine* to preclude the introduction of evidence of the collateral social benefit of cigarette production is firmly grounded in a proper reading of New Jersey precedent, as well as a correct interpretation of strict liability theory generally. Defendants having produced no persuasive argument to contest plaintiff's motion, it will be granted.