William I. KOCH, et al., Plaintiffs,

v.

KOCH INDUSTRIES, INC., et al., Defendants.

No. 85–1636–SAC.

United States District Court, D. Kansas.

March 20, 1998.

Clifford L. Malone, Adams, Jones, Robinson & Malone, Wichita, Thomas E. Wright, Wright, Henson, Somers, Sebelius, Clark & Baker, LLP, Topeka, Harry L. Najim, Najim Law Offices, Wichita, John T. Hickey, Jr., Alex Dimitrief, Kirkland & Ellis, Chicago, IL, Ellen A. Cirangle, Bartlit, Beck, Herman, Palenchar & Scott, Denver, CO, Gregory S.C. Huffman, L. James Berglund, II, Thompson & Knight, Dallas, TX, Russell E. Brooks, Milbank, Tweed, Hadley & McCloy, New York, NY, Stephen M. Joseph, Redmond & Nazar, L.L.P., Wichita, Michael Paul Kirschner, Lee & Kirschner, P.L.L.C., Oklahoma City, OK, for William I Koch, Oxbow Energy Inc, L.B. Simmons Energy Inc. dba Rocket Oil Company, United States Trust Company of New York, as Trustee, Spring Creek Art Foundation Inc, Gay A. Roane, Ann Alspaugh, Marjorie Simmons Gray, as Trustee, Northern Trust Company, as Trustee, Marjorie L. Simmons, as Trustee, Louis Howard Andres Cox, Paul Anthony Andres Cox, Holly A. Andres Cox Farabee, Frederick R. Koch, Nationsbank N A, co-trustee of the Louis Howard Andres Cox Trusts B & D, plaintiffs.

James M. Armstrong, Robert L. Howard, Timothy B. Mustaine, Foulston & Siefkin L.L.P., Donald L. Cordes, Koch Industries, Inc., Wichita, for Koch Industries Inc., Charles G. Koch, Sterling V. Varner, David H. Koch, Donald L. Cordes, Thomas M. Carey, defendants.

Michael W. Merriam, Gehrt & Roberts, Chartered, Daniel R. Lykins, Bryan, Lykins & Hejtmanek, P.A., Topeka, for Kansas Press Association, Kansas Association of Broadcasters, Wichita Eagle–Beacon, Topeka Capital–Journal, WIBW–TV, Kansas City Star Company, the Wichita Business Journal, Harris Enterprises, Inc., Koch Crime Comm, movants.

## MEMORANDUM AND ORDER

CROW, Senior District Judge.

The case comes before the court on a number of pretrial filings. The plaintiffs have filed the following motions in limine: Number 1—Post 1985 Lawsuits (Dk.663); Number 2—Plaintiffs' Consultations with Health Professionals (Dk.664); Number 3—Plaintiffs' Lifestyles (Dk.664); Number 4—Plaintiffs' "Reneging" on other Business Deals (Dk.664); Number 5—Plaintiffs' Post Filing Investigations of Defendants (Dk.664); Number 6—Pretrial Judicial Commentary (Dk.665); Number 7—Withdrawal or Dismissal of Claims (Dk.666); and Number 8—Lawyers and Experts (Dk.667). The defendants have filed the following motions in limine: Number 1—Exclude Allegations of Document Destruction (Dk.668); Number 2—Exclude Improper Testimony on Accounting Issues (Dk.669); Number 3—Exclude Testimony of Kenneth McGraw on Changed Method of Valuation and Assignment of Value to Premium for Control (Dk.670); and Number 4—Exclude Testimony of John O'Brien on Value of Pine Bend Refinery (Dk.671). After duly considering the memoranda and all relevant law, the court rules as follows.

## GENERAL RULES GOVERNING MOTIONS IN LIMINE

The motion in limine is a creature of neither the Federal Rules of Civil Procedure nor the Federal Rules of Evidence. *Deghand v. Wal–Mart Stores, Inc.*, 980 F.Supp. 1176, 1179 (D.Kan.1997). Its purpose is " 'to aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial.' " *Palmieri v. Defaria*, 88 F.3d 136, 141 (2nd Cir.1996) (quoting *Banque Hypothecaire Du*

*Canton De Geneve v. Union Mines, Inc.,* 652 F.Supp. 1400, 1401 (D.Md.1987)). Besides saving trial time, pretrial rulings often may save the parties time, effort and cost in preparing and presenting their cases. *Pivot Point Intern., Inc. v. Charlene Products, Inc.,* 932 F.Supp. 220, 222 (N.D.Ill.1996). On the other hand, a court is almost always better situated during the actual trial to assess the value and utility of evidence. For this reason, some courts defer making in limine rulings unless the "evidence is clearly inadmissible on all potential grounds." *Hawthorne Partners v. AT & T Technologies, Inc.,* 831 F.Supp. 1398, 1400 (N.D.Ill.1993) ("Unless evidence meets this high standard, evidentiary rulings should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in proper context.")

 Having a deep appreciation for the potential savings from in limine rulings, this court does not take the strict approach followed by some courts. Still, the court believes the better practice is to wait until trial to rule on objections when admissibility substantially depends upon what facts may be developed there. *See Sperberg v. Goodyear Tire & Rubber Co.,* 519 F.2d 708, 712 (6th Cir.), *cert. denied,* 423 U.S. 987, 96 S.Ct. 395, 46 L.Ed.2d 303 (1975); *Hunter v. Blair,* 120 F.R.D. 667 (S.D.Ohio 1987). This is particularly the case when a ruling in limine would have little impact on the parties' evidentiary burdens or preparation for trial. *Cipollone v. Liggett Group, Inc.,* 644 F.Supp. 283, 286 (D.N.J.1986). The movant has the burden of demonstrating that the evidence is inadmissible on any relevant ground. *Plair v. E.J. Brach & Sons, Inc.,* 864 F.Supp. 67, 69 (N.D.Ill.1994). The court may deny a motion in limine when it "lacks the necessary specificity with respect to the evidence to be excluded." *National Union v. L.E. Myers Co. Group,* 937 F.Supp. 276, 287 (S.D.N.Y. 1996).

 At trial, the court may alter its limine ruling based on developments at trial or on its sound judicial discretion. *Luce v. United States,* 469 U.S. 38, 41, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984). "Denial of a motion in limine does not necessarily mean that all evidence contemplated by the motion will be admitted at trial." *Hawthorne Partners v.*

*AT & T Technologies, Inc.,* 831 F.Supp. at 1401. Denial only means that the court cannot decide admissibility outside the context of trial. *Plair v. E.J. Brach & Sons, Inc.,* 864 F.Supp. at 69. A ruling in limine does not "relieve a party from the responsibility of making objections, raising motions to strike or making formal offers of proof during the course of trial." *Thweatt v. Ontko,* 814 F.2d 1466, 1470 (10th Cir.1987) (internal quotation omitted).

## PLAINTIFFS' MOTIONS IN LIMINE

By their motions, the plaintiffs seek an order in limine that would exclude all references and evidence concerning eight separate areas. Based on the memoranda filed in response and reply, the court believes the parties agree that a limine order should issue on three of those areas. Thus, the court orders that all parties and counsel are precluding from presenting evidence or referring to the following:

1) The parties' personal lives or lifestyles, including their marital or other personal relationships, recreational interests, hobbies, passions, political or religious beliefs or unrelated financial endeavors;

2) The comments, findings, or rulings made by this court or any other court concerning the plaintiffs, the defendants or any of the claims in this case or any other litigation involving these parties; and

3) The plaintiffs' counsel or experts who have withdrawn or been replaced during this litigation, except for showing witness bias through evidence of what prior counsel may have instructed and paid expert witnesses.

The parties do not agree on the other five areas and leave them to the court for decision. Before turning to these areas, the court will summarize that law common to its rulings.

"Relevant evidence" is that evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. "Relevancy is not an inherent characteristic of any item of evidence but exists only as a relation between

an item of evidence and a matter properly provable in the case." Fed.R.Evid. 401 adv. comm. note. "All relevant evidence is admissible except" when exclusion is called for by the rules, by the statutes, or by constitutional considerations. Fed.R.Evid. 402. For example, the court may exclude relevant evidence when "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed.R.Evid. 403.

■ Because one side or the other will almost always consider a piece of evidence to be prejudicial, courts generally believe the jury is best able to determine the truth when given access to all the relevant admissible evidence. *S.E.C. v. Peters,* 978 F.2d 1162, 1171 (10th Cir.1992). Consequently, Rule 403 sets a standard for exclusion that is "somewhat exacting." *C.A. Associates v. Dow Chemical Co.,* 918 F.2d 1485, 1489 (10th Cir.1990). Rule 403 considerations impacted by the evidence must "substantially outweigh" its probative value. The Tenth Circuit "on numerous occasions" has said that " 'exclusion of relevant evidence under Rule 403 is an extraordinary remedy to be used sparingly.' " *Wheeler v. John Deere Co.,* 862 F.2d 1404, 1410 (10th Cir.1988) (citations omitted); *see Joseph v. Terminix Intern. Co.,* 17 F.3d 1282, 1284 (10th Cir.1994). Balancing the probative value of and need for evidence against the competing considerations of Rule 403 is a task for which the trial judge by his position and familiarity with the case is particularly well suited. *McAlester v. United Air Lines, Inc.,* 851 F.2d 1249, 1257 (10th Cir.1988). In weighing the factors under Rule 403, the court should generally " 'give the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value.' " 1 J. Weinstein & M. Burger, *Weinstein's Evidence* ¶ 403[03], at 403–25 to 403–26 (1982)." *K–B Trucking Co. v. Riss Intern. Corp.,* 763 F.2d 1148, 1155 n. 9 (10th Cir.1985). Finally, a 403 inquiry focuses on whether the evidence results in "unfair prejudice," that is, does the evidence have "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Fed.R.Evid. 403 adv. comm. note. *See Espeaignnette v.*

*Gene Tierney Co., Inc.,* 43 F.3d 1, 7 (1st Cir.1994) (Undoubtedly, "all evidence is meant to be prejudicial; elsewise, the proponent would be unlikely to offer it.").

■ "Although not specifically mentioned in the Rules, proof of bias," that is, any evidence of a relationship, circumstance or motivation " 'which might lead a witness to slant, unconsciously or otherwise, his testimony' " is " 'almost always relevant.' " *United States v. Spencer,* 25 F.3d 1105, 1109 (D.C.Cir.1994) (quoting *United States v. Abel,* 469 U.S. 45, 52, 105 S.Ct. 465, 83 L.Ed.2d 450 (1984)). "A successful showing of bias on the part of a witness would have a tendency to make the facts to which he testified less probable in the eyes of the jury than it would be without such testimony." *United States v. Abel,* 469 U.S. at 51, 105 S.Ct. 465. Courts generally are "liberal" in admitting evidence of bias because a jury "must be sufficiently informed of the underlying relationships, circumstances, and influences operating on the witness to determine whether a modification of testimony reasonably could be expected as a probable human reaction." 4 Jack Weinstein & Margaret Berger, *Weinstein's Federal Evidence* § 607.04[1] (2d ed.1997). "Proof of a witness's motivation or potential bias is critical when the witness is a party and key witness to the alleged events." *Cf. Henry v. Speckard,* 22 F.3d 1209, 1215 (2nd Cir.), *cert. denied,* 513 U.S. 1029, 115 S.Ct. 606, 130 L.Ed.2d 517 (1994). "[T]he range of evidence that may be elicited for the purpose of establishing bias of a witness is quite broad." 4 Jack Weinstein & Margaret Berger, *Weinstein's Federal Evidence* § 607.04[3][b] (2d ed.1997).

*Post 1985 Lawsuits*

The plaintiffs ask the court to "prohibit any references at trial and exclude any evidence offered by defendants concerning other lawsuits involving the plaintiffs that were initiated after June 7, 1985." (Dk.663, p. 1). In their motion, the plaintiffs list fifteen other lawsuits that involve one or more of the plaintiffs or defendants and that were filed after 1985. The plaintiffs also refer to the defendants' accusation that William Koch was "instrumental" in providing information

that led to investigations by a United States Senate and grand jury into Koch Industries, Inc. ("KII") on the issue of "oil-stealing." (Dk.663, p. 3). The plaintiffs argue that the defendants have already used in the summary judgment proceedings and intend to use at trial these other lawsuits to portray the plaintiffs, in particular William Koch, "as litigious and as 'sponsoring' 'unsuccessful' litigation." (Dk.663, p. 3).

The plaintiffs argue the other lawsuits are unrelated to the merits of the instant case and, thus, are not relevant under Fed. R.Evid. 402. Because these lawsuits were subsequent to the instant case, they do not show any relationships or states of mind that would be relevant here. To the extent that the other lawsuits may reveal motives behind their filing of them, such motives cannot be linked to this lawsuit and, more importantly, the plaintiffs' motives for bringing this lawsuit are not relevant to its merit. If the defendants' intend to use this evidence to show the plaintiffs' proclivity to litigate, the plaintiffs argue the same would be inadmissible under Rules 403 and 404. A "plaintiff's 'litigiousness may have some slight probative value ... that value is outweighed by the substantial danger of jury bias against the chronic litigant' " and is a character trait subject to Rule 404(b) concerns. *Outley v. City of New York,* 837 F.2d 587, 592 (2nd Cir.1988) (quoting *Raysor v. Port Authority,* 768 F.2d 34, 40 (2nd Cir.1985), *cert. denied,* 475 U.S. 1027, 106 S.Ct. 1227, 89 L.Ed.2d 337 (1986)). The plaintiffs emphasize that "opening up this area thus invites detailed inquiries, denials, and explanations, likely to lead to multifariousness and a confusion of issues." *Outley,* 837 F.2d at 595.

The defendants say they agree with an order in limine precluding all parties from making any reference to the following eight cases:

*In re Ann A. Linn,* filed February 3, 1988, in the United States Bankruptcy Court for the Western District of Oklahoma, Case No. 88–00711–TS.

*In re James P. Linn, Debtor,* filed February 3, 1988, in the United States Bankruptcy Court for the Western District of Oklahoma, Case No. 88–00712–TS.

*International Oil Resources, Inc. v. Michael P. Aquilina, et al./Michael P. Aqui-*lina v. *William I. Koch, et al.,* filed March 3, 1988, in the United States District Court for the Central District of California, Case No. CV 88–01168 PAR (GXKx).

*Ann A. Linn v. James P. Linn,* decree of divorce filed January 5, 1989, in the District Court of Oklahoma County, Oklahoma, Case No. FD–88–8451.

*United States of America, ex rel. The Precision Company v. Koch Industries, Inc., et al.,* ("Precision I"), filed May 25, 1989, in the United States District Court for the Northern District of Oklahoma, Civil Action No. 89–C–437–C.

*United States of America, ex rel. The Precision Company v. Koch Industries, Inc., et al.,* ("Precision II"), filed September 30, 1991, in the United States District Court for the Northern District of Oklahoma, Civil Action No. 91–C–763–B.

*Louis Howard Andres Cox v. William I. Koch, et al.,* filed November 21, 1991, in the United States District Court for the Western District of Oklahoma, Case No. CIV–91–1921–A.

*Marjorie Simmons Gray, et al. v. Louis Howard Andres Cox,* filed November 21, 1994, in Probate Court, Harris County, Texas Case No. 271283.

Thus, the court grants the plaintiffs' motion in part and orders all parties not to refer to the above eight cases.

The defendants argue that they intend to refer to the following seven lawsuits, evidence of which they believe is relevant:

*Koch Industries, Inc. v. William I. Koch, et al.,* filed May 4, 1987, in the United States District Court for the District of Kansas, Civil Action No. 87–1249–C.

*William I. Koch v. Charles G. Koch, et al.,* filed August 14, 1987, in the Eighteenth Judicial District for Sedgwick County, Case No. 87–C–3006.

*Oxbow Energy, Inc. et al. v. Koch Industries, Inc., et al.,* filed August 26, 1987, in the United States District Court for the District of Kansas, Civil Action No. 87–2436–S.

*William I. Koch and Frederick R. Koch v. Charles G. Koch, et al.,* filed May 19, 1988,

in the Eighteenth Judicial District Court for Sedgwick County, Case No. 88–C–1782. *Charles G. Koch, et al. v. William I. Koch,* filed May 23, 1988, in the United States District Court for the District of Kansas, Civil Action No. 88–1320–K.

*William I. Koch v. United States,* filed August 3, 1988, in the United States Claims Court, Docket No. 466–88T.

*In the Matter of the Estate of Mary R. Koch, Deceased,* filed December 20, 1990, in the Eighteenth Judicial District Court, Sedgwick County, Kansas, Probate Department, Case No. 90–P–1491.

The defendants believe evidence of these lawsuits is admissible to demonstrate the bias of William Koch and thereby impeach his testimony and also admissible to prove that William Koch did not rely on the defendants, in particular Charles and David Koch, for disclosure of all facts material in his decision to sell the stock. The defendants argue that William Koch's animosity for his brothers, Charles and David, is so intense that he has an ongoing vendetta against them and KII. The defendants insist this animosity is revealed in part by William Koch's pattern of suing his brothers.

Instead of the settlement that resulted in the 1983 Stock Purchase Agreement ("SPA"), William Koch wanted to continue with the litigation. Besides filing the instant case, William Koch pursued other expensive litigation against his brothers. He sued over the family charitable foundation and its distribution of funds to beneficiaries, he named his mother as a co-defendant in one suit involving the foundation, and he even challenged his mother's will as it conditioned his inheritance upon him terminating the pending family litigation. Charles and David Koch also sued William for specific performance when William allegedly reneged on his promise to his brothers to have certain property appraised and exchanged by agreement. The defendants assert that William Koch's financial interest in these other lawsuits is so modest as to reveal that William is driven by his animosity to sue his brothers.

The defendants point out that William Koch is not only the lead plaintiff, but he will likely be the fact witness most critical to the plaintiffs' success. In addition, William Koch assumed a leadership role with respect to the other selling shareholders and possessed more technical knowledge of the facts and issues by reason of his education, training and experience. The defendants anticipate that the plaintiffs will attempt to paint their litigation as one of strictly business and not personal matters. The defendants want to use this other litigation to show that the plaintiffs have pursued litigation against them when business could not have been the motive. Finally, the defendants maintain this evidence shows that William Koch has "harbored longstanding mistrust toward defendants" which makes it less probable that he relied on their disclosures in deciding to sell. (Dk.689, p. 8).

In reply, the plaintiffs ask the court to "preclude defendants from making any allegations or introducing any evidence suggesting that Bill Koch is engaged in an 'ongoing vendetta' or has an 'obsessive hatred' of Charles and David Koch." (Dk.704, p. 3). The plaintiffs insist such evidence is manifestly prejudicial and should be excluded under Rule 403. The plaintiffs dispute any effort to characterize this litigation as the product of family strife as opposed to the defendants' own fraudulent conduct. The plaintiffs indicate that the family relationships "are at least as complicated in their own right" as the alleged claims for trial. (Dk.704, p. 5). The plaintiffs suggest that "[l]iterally weeks of trial could be devoted" to these family issues and that this would be a serious distraction to the jury. (Dk.704, p. 5).

### Ruling

After supervising this case for over a decade, the court believes it has gained some knowledge and insight into what could be called some of the more important aspects of this litigation. For example, the court understands that William Koch's animosity for Charles and David, the intensity of those feelings, and the actions that reveal those feelings are central to the defendants' case in several regards. First, the defendants believe these feelings serve as explanatory background to most, if not all, of the disputes and conflicts resulting in the filing of the first Koch case, the settlement of that case, and the filing of the case now going to trial.

Second, these feelings are plainly relevant in determining whether William Koch actually trusted and relied upon the defendants to make full and complete disclosures. Third, these feelings directly bear on William Koch's credibility as a fact witness to the plaintiffs' knowledge and to the defendants' representations and omissions. The court will not eviscerate the defendants' case by precluding them from using relevant evidence to prove these critical points.

It seems undeniable to the court that the issues of this case are inextricably tied to the parties' familial relations. They are the backdrop that explain so many features of this complex litigation, beginning with why the parties were shareholders in KII. Enmeshed in their business dealings and this litigation is the state of the parties' familial relations. Such relations irrefutably trigger emotions that can and may affect the judgment of those involved. For that simple reason, a party cannot simply label the situation as a business dispute and make himself or itself immune from evidence concerning possible emotional motives. The court fully appreciates that emotional responses are highly personal, often depend on many circumstances, and may change frequently. Even so, jurors in almost every case are asked to rely on their own experiences and common sense in discerning what are the witnesses' and parties' likely emotions and motives and what would one reasonably expect from persons acting on those emotions or motives. Evidence on such matters is almost always relevant, and this case is no exception but a good example of when such evidence may be relevant. The court is simply convinced that the trial of this case cannot be divorced from the familial relations, problems, conflicts and disputes without seriously misleading the jury.

The plaintiffs' concerns that the evidence of these other lawsuits will be used to paint

the plaintiff as a "litigious character" who files lawsuits devoid of merit are overstated and maybe even misplaced. The court does not understand the defendants as intending to use this evidence for this objectionable reason. Upon a timely objection, the court would cut off any effort to use this evidence only for that reason.[1] Besides controlling the extent of inquiry, the court would consider giving a limiting instruction to minimize the potential for unfair prejudice and/or delay from this evidence. *See S.E.C. v. Peters*, 978 F.2d at 1172–73.

 That these lawsuits were filed after 1985 does not significantly diminish their probative value in showing William Koch's bias at trial and his attitude towards his brothers at the time of the SPA. William Koch's willingness to sue the Koch Foundation and even his mother over another dispute with his brothers has probative value in revealing the degree or intensity of his alleged animosity towards his brothers. The jury is entitled to hear evidence and decide the extent of bias. *Heath v. Cast*, 813 F.2d 254, 259 (9th Cir.), *cert. denied*, 484 U.S. 849, 108 S.Ct. 147, 98 L.Ed.2d 103 (1987). The court denies the request for an order in limine covering these other lawsuits or evidence suggesting that William Koch is engaged in an "ongoing vendetta" against his brothers, Charles and David Koch.

*Plaintiffs' Consultations with Health Professionals*

Citing *United States v. Jackson*, 863 F.Supp. 1462, 1465 (D.Kan.1994), *aff'd*, 76 F.3d 1145 (10th Cir.1996), the plaintiffs argue that evidence of the plaintiffs' consultations for psychological or psychiatric purposes is irrelevant to the issues here and is subject to exclusion as unfairly prejudicial under Rule 403. The defendants say they "intend to show that William Koch's lifelong history of

---

1. At this time, the court does not consider the defendants' reference and use of these lawsuits in proving bias and reliance as necessarily opening the door to the plaintiffs' use of the *Precision qui tam* litigation to show that William Koch brings meritorious suits against his brothers. The defendants argue the principal evidentiary value of these other lawsuits is to reveal and substantiate William Koch's animosity for his brothers, the intensity of William Koch's feelings, and the con-

duct probably resulting from those feelings. To avoid lengthy delay, the court would hope that the defendants can offer this evidence for these specific grounds without delving into the details, actual merit or judicial outcome of those lawsuits. For the same reason, the court would hope that the plaintiffs can refute the specific grounds for which this evidence is offered without inserting the details, actual merit or judicial outcome of those lawsuits or any other lawsuits.

feelings of inferiority and troubled relations with his brothers ... were the focus of his psychiatric treatment and that part of his psychotherapy was to 'climb out of his depression over the backs of his family.'" (Dk.689, p. 11). The defendants argue the same explains William Koch's multiple lawsuits and his animosity toward Charles Koch.

### Ruling

▮ The defendants' intended use of this evidence is not to attack William Koch's ability to perceive the events at issue, to recall clearly the events, or to testify accurately and truthfully about them. The defendants want to introduce evidence of William Koch's "psychiatric treatment" and "psychotherapy" as proof of his troubled feelings toward his brother Charles and as an explanation for this litigation being part of his therapy. This evidence plainly has probative value to the extent that it tends to show William Koch's hatred and distrust of Charles Koch and William Koch's efforts or actions as a result of these feelings. Because neither side discloses the specifics of this evidence and, in particular, the manner in which it would be introduced, the court is not in a position to assess and balance the relevant considerations under Rule 403. The court will not exclude the evidence at this time simply because such evidence could be embarrassing and personally intrusive. Having failed to carry their burden, the plaintiffs are denied an order in limine excluding evidence that the focus of the plaintiff William Koch's "psychiatric treatment" and "psychotherapy" was his troubled relations with his brothers.

### Plaintiffs' "Reneging" on Other Business Deals

This evidence concerns William Koch's refusal to pay Goldman Sachs the full fee under the contract and refusal to pay Jim Linn a promised fee for his work in settling Koch I. The plaintiffs argue this evidence is without probative value to this case or to the credibility of the plaintiffs and should be excluded under Rule 403 because of "the very profound danger of unfair prejudice implicit in raising accusations that the plaintiffs have 'reneged' on various agreements." (Dk.664, p. 5). The defendants argue the evidence is relevant in showing William Koch's animosity toward his brothers and "attitude toward

those whom he viewed as instrumental in pushing the settlement at $200 per share." (Dk.689, p. 12).

### Ruling

▮ The court sees minimal relevance in whether William Koch actually paid the full contract fee to Goldman Sachs or the promised settlement fee to Jim Linn. The court anticipates there will be a substantial amount of other evidence indicating that William Koch was not pleased with the $200 price at the time of the SPA. There does appear some potential for unfair prejudice if the jury would infer from this evidence that William Koch is someone who breaches agreements. The court sustains the plaintiffs' motion in limine to exclude this evidence.

### Plaintiffs' Post Filing Investigations of Defendants

This evidence concerns William Koch hiring a private investigator in 1992 to search the trash of Charles Koch, Donald Cordes, Robert Howard or James Armstrong, and the defendants' law firm. On the defendants' application, the court entered a temporary restraining order ("TRO") on March 25, 1992, that in part restrained the plaintiffs and their agents or investigators from "invading or interfering with the privacy and confidentiality interests of the defendants, their counsel, and their immediate families, either through efforts to obtain the trash from the personal residences or the offices" of the defendants or their counsel. (Dk.450, p. 2). The plaintiff William I. Koch filed a memorandum in opposition to the continuation of the TRO and attached his declaration in which he said these investigatory efforts were taken in an effort to learn how the defendants were gaining access to documents within his corporation. (Dk.452). William Koch further affirmed that he had terminated all such investigation efforts. "[B]ased upon statements of counsel made in" court, the defendants consented to the court ordering the dissolving the TRO on March 31, 1992. (Dk.456). The plaintiffs argue this evidence is irrelevant to the issues, is not probative of William Koch's credibility, and is unfairly prejudicial. The defendants argue that William Koch's "bizarre" and self-direct-

ed efforts at investigating the defendants and their counsel is "evidence of William Koch's obsessive vendetta against his brothers and those aligned with them."

### Ruling

 This evidence arguably has some probative value in that gives the jury some insight into the intensity of the feelings involved and the actions possibly taken as a result of them. The court's principal reservation with this evidence is that it logically opens the door for an inquiry into all private investigatory activities involved in this case. For the plaintiffs to refute this evidence, William Koch presumably will testify about his own concerns of investigation, surveillance and covert document collection being directed at him and his associates. A number of serious issues present themselves once we start down that collateral path. The court believes this evidence is not so important to the defendants' case as to risk the issues and delay likely to arise with this evidence. Frankly, the jury will have enough opportunities to be confused over the facts and issues in this case without inserting a detective mystery novella. The court grants the plaintiffs' motion in limine and orders all parties and counsel to not present evidence nor refer to any investigations or surveillance of the personal residences and offices of the parties, their counsel and agents.

### Withdrawal or Dismissal of Claims

The plaintiffs seek an order prohibiting any references at trial and excluding any evidence regarding the plaintiffs' withdrawal of claims or the court's dismissal of claims. The plaintiffs argue such evidence or remarks are not relevant to the claims and issues remaining for trial. If the defendants raise this matter, the plaintiffs insist they are entitled to an opportunity to explain the former claims in order to rebut the implication that these claims were not made in good faith. The defendants agree that no evidence should be admitted by either side concerning the dismissal or withdrawal of any claim or defense in this case. The defendants, however, do intend to introduce evidence that William began investigating KII shortly after the SPA, that William Koch sent a pre-suit demand letter in 1985, and

that the claims going to trial were not part of the case when it was filed. The plaintiffs reply that the pre-suit demand letter and the later addition of these claims is not relevant.

### Ruling

 The court grants the plaintiffs' motion insofar as both sides agree that no evidence should be admitted by either side concerning the dismissal or withdrawal of any claim or defense in this case. The court does not consider the following evidence to have been covered by the plaintiffs' original motion in limine: that William began investigating KII shortly after the SPA, that William Koch sent a pre-suit demand letter in 1985, and that the claims going to trial were not part of the case when it was filed to be covered by the plaintiffs' original motion. The court alternatively denies the plaintiffs' request to exclude this other evidence described by the defendants. The court believes the fact that these claims were omitted from the plaintiffs' pre-suit demand letter and original complaint could be relevant to the statute of limitations defense asserted by some of the defendants.

## DEFENDANTS' MOTIONS IN LIMINE

### Allegations of Document Destruction

The defendants seek an order prohibiting the plaintiffs from mentioning any alleged destruction of evidence relating to this case or any other litigation involving the defendants, including: 1) document destruction evidence from the Oklahoma litigation; 2) the gap in document production concerning the alleged Williams Pipeline reversal agreement; and 3) Peat Marwick's destruction of its audit work papers for 1981 and 1982. The defendants note that the court has denied the plaintiffs' two attempts to re-open discovery on the allegation of document destruction. The defendants argue the so-called "ominous gap" in KII's documents on the Williams Pipeline reversal agreement is not suspicious and if presented to the jury would be prejudicial and confusing and would unduly prolong the trial. Finally, the defendants note that there is no reasonable basis for believing that Peat Marwick's destruction of its work papers before the plaintiffs ever

pleaded their accounting claims was improper or wrongful.

The plaintiffs say they do not intend to introduce any evidence concerning document destruction in the Oklahoma litigation. The plaintiffs argue evidence on the other two matters is relevant and admissible in this case. The plaintiffs point out that the defendants did not produce any documents from the period between December 1982 to June 1983 that addressed the Williams Pipeline reversal negotiations or alleged agreement. Documents dated October of 1982 refer to negotiations with Williams Pipeline including plans to "loop the receiving line from" Pine Bend Refinery to Williams Pipeline's Rosemount station. (Dk.691, Ex. A). Sterling Varner's notes from the same time period also refer to Williams Pipeline laying the pipeline from Pine Bend to Rosemount. The next document concerning the Williams Pipeline reversal that was produced by the defendants is an inter-company memorandum dated June of 1983 and addressed to W. Hanna and others concerning the "Pine Bend Desulfurizer/Hydrocracker Basis." The memorandum includes the comment that "[t]he ability to pump gasoline south on Williams will allow production above the current 80 MB/D economic marketing limit." (Dk.691, Ex. C). According to the plaintiffs, this is document gap, the period between October 1982 and June 1983, shown by what the defendants produced during discovery.

The plaintiffs say they have found in public files certain relevant documents from this period of the document gap. The plaintiffs attach copies of documents they obtained from the Dakota County, Minnesota Department of Highways that include correspondence and permit applications filed by Williams Pipeline dated between March of 1983 and June of 1983. These documents discuss Williams Pipeline's construction of a pipeline between the refinery and the Rosemount station. The permit application states that Williams' work would commence on or after May 1, 1983, and would be completed by September 1, 1983.

As for the Peat Marwick work papers, the plaintiffs say that "if the defendants rely upon Peat Marwick's audit certificate as some sort of blessing of their financial statements, plaintiffs should be allowed to inform the jury that the work papers for the audit were destroyed." (Dk.691, p. 6). The plaintiffs believe the absence of the work papers is relevant in evaluating the weight of Peat Marwick's audit opinion. An auditor relies upon representations made by the company's management, and an auditor's opinion is necessarily based in part on what management disclosed or failed to disclose to the auditor. The auditor's work papers are some evidence of what were the company's representations on which the auditor relied. That Peat Marwick destroyed the papers is simply a fact which explains the absence of the work papers which normally would be relevant evidence in evaluating the weight of an auditor's opinion.

### Ruling

Consistent with the parties' agreement, the court directs the parties to refrain from arguing or referring to the document destruction allegations or evidence in the Oklahoma litigation. The court denies the defendants' motion in limine concerning the other two areas of document destruction. The gap in KII's production of documents on the Williams Pipeline reversal may be a relevant point for argument assuming that the plaintiffs can show a reasonable basis for inferring that relevant documents from that time period should have been in the defendants' possession. The jury is entitled to draw inferences based on the absence of documents that one would reasonably expect to be in a party's possession. Peat Marwick's destruction of its work papers is relevant in the event that the defendants introduce and rely on Peat Marwick's audit opinions for 1981 and 1982. In evaluating the weight of those audit opinions, the jury should be told that the opinions cannot be checked against the underlying work papers, because the latter documents were destroyed as part of Peat Marwick's regular six-year retention policy. The court would consider giving a requested limiting instruction that addressed the defendants' concerns over other possible adverse inferences being drawn from this evidence. Thus, the court denies the defendants' motion in limine except for ordering the parties to refrain from mentioning the document destruction allega-

tions and evidence in the Oklahoma litigation.

*Improper Testimony Relating to Accounting Issues*

The plaintiffs have designated two witnesses to testify as experts in accounting, K. Gary Gibbs ("Gibbs") and Alan May, Jr ("May"). The defendants seek to exclude that portion of Gibbs' testimony which they argue is Gibbs' interpretation of the SPA and to exclude the entirety of May's testimony which they argue is without a factual foundation and is nothing more than his vouching for Gibbs' conclusions and credibility. The plaintiffs dispute the defendants' characterizations of Gibbs' and May's testimony.

In the court's summary judgment order, the following paragraph appears:

13. Gibbs testified that the $3.1 million of losses on Kerr McGee and Northwest Portland Cement shares included in Hall's list were "not necessarily" unusual or infrequently occurring. (DX–Acct 14, p. 425). He included them as unusual or infrequent, because they were on Hall's list and because their disclosure would be required by ¶ 5(d) of the SPA. Hall's list included $2.6 million for a dry hole in Columbia. Gibbs testified that he generally did not consider dry holes to be "unusual" or "infrequently recurring" and that dry holes did not necessarily meet those definitions. He opined that ¶ 5(d) of the SPA required disclosure and that disclosure would "make the financial statements informative and useful." (DX–Acct 14, p. 435–36). Gibbs also avers he included the dry hole expenses as non-recurring because they were on Hall's list and Hall testified all of the listed expenses were non-recurring. (PX 430, ¶ 11).

969 F.Supp. at 1561 (footnote omitted). In his written report, Gibbs similarly opines that the defendants' failure to disclose the amounts of losses which KII management considered to be "extraordinary losses" and asset "write downs" is contrary to the requirements of ¶ 5(d) of the SPA. (Dk.693, Ex. B, pp. 26–27).

The defendants seek to preclude Gibbs from testifying about any violation of ¶ 5(d) of the SPA arguing that this opinion would be outside Gibbs' accounting expertise, that

the opinion requires Gibbs to interpret ¶ 5(d) of the SPA, and that the opinion is based on an interpretation of the SPA that is erroneous as a matter of law. As far as his expertise, Gibbs' understanding of what a prudent investor would want to know is limited, according to the defendants, to the context of what an accountant would consider as material disclosures in connection with preparing financial statements. (Dk.669, Ex. B, p. 241, 243). To opine that ¶ 5(d) is violated, Gibbs must interpret the provisions of that paragraph. In defendants' opinion, Gibbs' interpretation of ¶ 5(d) is erroneous as that paragraph only deals with *financial statement* matters occurring after December 31, 1982, and these alleged accounting errors in 1982 did not occur after December 31, 1982. Past accounting errors are not kind of current events, conditions, or facts that the parties intended ¶ 5(d) to cover. The defendants argue that the parties intended ¶ 5(c) to address accounting issues connected to past financial statements and intended ¶ 5(d) to cover numerous subject matters that were not covered by the financial statements. They also argue that Gibbs' interpretation of the second sentence in ¶ 5(d) renders superfluous all other provisions in ¶ 5.

The plaintiffs say that the defendants mischaracterize Gibbs' testimony as a legal construction of ¶ 5(d) when it is really being offered on the question whether the defendants' improper accounting treatment of certain expenses "might have materially affected" a prudent investor's valuation of his stock. The plaintiffs deny that Gibbs' written report contains any interpretation of ¶ 5(d), but they admit that Gibbs' opinion on the defendants' accounting omissions violating ¶ 5(d) "reflect[s] a straight-forward application of Section 5(d)'s plain and unambiguous language warranting that defendants have disclosed any information that 'might materially affect the valuation of the stock.'" The plaintiffs also acknowledge that Gibbs' report does discuss whether defendants' accounting practices were material. The plaintiffs refute any attempt to limit the scope of the warranty found in the second sentence of ¶ 5(d) to events occurring after December 31, 1982. Finally, the plaintiffs complain that a motion in limine is not the proper vehicle for

asking the court to interpret ¶ 5(d) of the SPA.

The plaintiffs' other accounting expert is Alan May. The defendants seek to exclude the entirety of May's testimony. The defendants first argue that May should not be allowed to give his opinion as he does not have sufficient knowledge of KII's financial information to apply generally accepted accounting principles ("GAAP") principles. The defendants label May a "phantom expert" whom the plaintiffs offer only for the improper purpose of vouching for Gibbs' credibility and conclusions. (Dk.669, p. 9). The defendants believe May's testimony is "nothing more than an argument that the jury should rely upon or draw certain conclusions from" Gibbs' testimony. (Dk.669, p. 11).

The plaintiffs recognize that May did not investigate KII's financial records to determine whether he would categorize the expenses as "unusual" or "infrequently occurring" and that May simply relied on Milton Hall's decision to include these expenses in Hall's list of "Extraordinary Items." The plaintiffs say this is enough for May to render an expert opinion. The plaintiffs explain that May will testify on another area, that is, whether the actual disclosure in the financial statement complies with GAAP. The plaintiffs say that May is competent to testify on the disclosure requirements under GAAP, the types of disclosures required for an accurate valuation of KII, the materiality of defendants' omissions, the effect that the omissions would have on a prudent investor's valuation of stock, and related issues. The plaintiffs say the focus of May's testimony will concern how such items should be properly treated or disclosed under GAAP once they are determined to be "unusual" and/or "infrequently occurring."

In reply, the defendants highlight the following argument found in the plaintiffs' response brief:

Plaintiffs must show that the way in which they were disclosed (or that they were not disclosed) in the financial statements failed to comply with the requirements of GAAP. *Similarly, defendants' disclosures concerning these items may have violated GAAP regardless of whether they were technically "unusual" or "infrequently oc-curring,"* as those terms are specifically defined in the accounting literature. As Mr. May explained in his deposition, GAAP requires that footnotes to financial statements "be reasonably adequate for an understanding of the financial statements" and that "when there is a choice of accounting principles that can be or are material to the financial statements, that those principles be disclosed."

(Dk.693, pp. 7–8) (italics added). The defendants sound the alarm that such testimony would exceed the scope of the plaintiffs' accounting claim: "What plaintiffs are saying is that May will redefine the accounting claim so that the jury could find in plaintiffs' favor even if they cannot prove their claim that the items on Mr. Hall's list were 'unusual' or 'infrequently occurring' within the GAAP definitions of those terms." (Dk.702, p. 7). The defendants argue this is clearly a new claim and that May should not be allowed to testify on this matter.

### Ruling

It would seem that the scope of the plaintiffs' claim for failure to disclose non-recurring expenses is again an issue of contention. The court thought it had written the last words on this subject in its summary judgment order when it wrote:

The court is satisfied that the plaintiffs' third amended complaint provides fair notice of an allegation that the footnote in the financial statements fails to disclose the actual nature of the expenses included in the $43.4 million figure. Moreover, the court believes the allegations at ¶ 38J(7) adequately encompass a claim that the defendants failed to disclose all non-recurring expenses, including those expenses found only on Markel's list.

969 F.Supp. at 1572. At that point, the court understood the plaintiffs' claim that KII failed to disclose its unusual and/or infrequently occurring losses as being based on the following specific allegations: 1) KII's actual disclosure at note 6 of the 1982 financial statement ($43.4 million "to reduce the carrying value of productive facilities to recoverable cost") does not comply with generally accepted accounting principles ("GAAP")

because it misleads a reader by calling this a "Depreciation, depletion and amortization" expense and because it does not disclose the nature and details of items included in this $43.4 million figure; and 2) KII did not include in its disclosure all amounts of losses (items on Hall's and Markel's lists) which were unusual or infrequently occurring and that this was a violation of the GAAP warranty in ¶ 5(c) and the materiality warranty in ¶ 5(d). It appears from the latest briefs that the plaintiffs consider their accounting claim to involve more than these allegations. In the following discussion and ruling, the court hopefully will clarify for the benefit of the parties its understanding of those allegations which it believes have been properly pleaded in the pretrial order.

The defendants have raised some serious issues with the plaintiffs' accounting claim and their use of accounting experts to prove those allegations. First, Gibbs is an accountant and not an investment adviser, securities broker or investment banker. As Gibbs has testified, his understanding of what a reasonable investor would want to know is based only on an accountant's working knowledge. (Dk.669, Ex. B, p. 243). In other words, Gibbs' understanding of material information for a reasonable investor is only in the context of what an accountant would need to know in preparing financial statements.[2] From what has been submitted, the record does not demonstrate that Gibbs' expertise in accounting matters qualifies him to testify on what information outside of financial statements might be material to a prudent investor. As the record now stands, Gibbs may be qualified to testify as to his understanding of materiality for a reasonable investor as an accountant would understand this standard in preparing financial statements. He is not now qualified, however, to testify generally on what information outside of financial statements would be material to a prudent investor.

Besides this issue with Gibbs' qualifications, the court shares the defendants' confusion and concern over what the plaintiffs

intend as their ¶ 5(c) and ¶ 5(d) theories for their accounting claim. The warranty in ¶ 5(c) plainly, if not fully, sets out the parties' understanding of what the defendants were warranting as to their financial statements and the matters covered therein. The defendants warranted that the financial statements "fairly present the consolidated financial condition and consolidated results of operations ... at such dates and for such respective periods in accordance with generally accepted accounting principles." As for ¶ 5(d), the defendants warranted in relevant part:

> Since December 31, 1982, there has been no material change in the assets, properties, business, operations, or condition (financial or otherwise) of Buyer and its subsidiaries taken as a whole. There is no event, condition or state of facts in existence on the date hereof which is known to the Buyer or any of its officers and has not been disclosed by Buyer to the Principal Sellers and is not otherwise actually known by the Principal Sellers which if fully disclosed might materially affect the valuation of the stock of the Buyer by a prudent and knowledgeable investor, excluding events, conditions and states of fact which have an effect on the oil industry in general.

In their response, the plaintiffs properly break down the first two sentences of ¶ 5(d) into two warranties: (1) that there has been no material change since December 31, 1982; and (2) that there is "no event, condition or state of facts" known by the buyers and not known by the sellers which if fully disclosed might materially affect a prudent and knowledgeable investor's valuation of the sellers' stock. The plaintiffs emphasize that their ¶ 5(d) theory on their accounting claim is limited to the second warranty. The plaintiffs, however, offer no further comments, arguments, or explanations as to what they believe on how ¶ 5(c) and ¶ 5(d) warranties function as separate theories for their accounting claim.

---

**2.** In his deposition, Gibbs was asked about his experience with the subject of what information would be material to a reasonable and prudent investor. (Gibbs Dep. pp. 240, 244–45). He testified that with respect to this subject he has not written any articles, he has not spoken or served on panels at seminars, and he has not been previously retained as an expert to give an opinion concerning information not found in financial statements.

A review of Gibbs' report and testimony sheds some light. At the front of his report, Gibbs summarized his findings as follows:

A) The financial statements of KII contain certain departures from GAAP, including in some instances a lack of adequate disclosures. Such departures, taken together, materially depart from the requirements of GAAP, including disclosures. Further, certain matters materially depart from GAAP on an individual basis.

B) There were in addition, material facts of a financial nature about KII which were known to KII management but which were not contained in the financial statements, descriptive memoranda or elsewhere in documents furnished to the selling shareholders, and which, if disclosed, "might materially affect the valuation of the KII stock by a prudent and knowledgeable investor."

(Dk.669, Ex. A, p. 2). In his report's discussion of the plaintiffs' claim for inadequate disclosure of infrequently occurring losses, Gibbs mentions ¶ 5(d) only in the following sentence: "Further, failure to disclose these amounts is clearly contrary to the requirements of paragraph 5(d) of the 1983 Stock Purchase Agreement." (Dk.669, Ex. A, p. 27). In his deposition, Gibbs offers the most insight into his understanding and apparently that of the plaintiffs on the workings of ¶ 5(c) and ¶ 5(d) with respect to their accounting claim:

Q. Is your testimony that ¶ 5(d) of the stock purchase agreement is no different from GAAP?

MR. SCOTT: Objection to form.

A. That's not my testimony.

Q. So your testimony is that there may be matters that are not GAAP violations in your opinion as an accountant but that would still fall under the ambit of ¶ 5(d) of the stock purchase agreement, is that what you are trying to say?

A. I would—

MR. SCOTT: Go ahead answer. Objection to form.

A. I would agree with the first part of your question.

Q. What part is that?

A. The part before, is that what I'm trying to say.

. . . .

Q. How is your opinion, vis-a-vis, GAAP which is reflected this ¶ A. on page of one of your report different from your opinion on ¶ 5(d) of the stock purchase agreement, aren't they one in the same?

A. I don't think so.

Q. Well, how are they different?

A. Well, there could very well be things that might materially affect the valuation of a reasonable and prudent investor but which would not, simply just not be a part of financial statements.

Q. Focusing only on financial statements, not on information that's not contained in financial statements, insofar as financial statements are concerned, is it your testimony that the requirements of GAAP and requirements of ¶ 5(d) of the stock purchase agreement are one in the same?

A. That's not my understanding.

Q. All right, how are they different.

A. Well, as I understand it, the focus of 5(d) is not necessarily on financial statements.

Q. My question limits you to financial statements and as to the financial statements, are the two one in the same?

. . . .

A. Well, again, my understanding of ¶ 5(d) is that its focus is not on the financial statements and so I don't know how to understand the question, how to respond to the question within the context of financial statements only.

(Dk. 669, Ex. B, pp. 242, 243, 246–47; DX–Acct 14, p. 244).

Q. Well, you make the statement on the bottom of page 26 of your report referring to this work sheet, "it appears none of the information on the attached analysis regarding 108 million dollars of matters considered by Koch Industries management to be extraordinary losses and asset write-downs in 1982 was furnished to the selling shareholders," is that correct?

A. You have read that section correct, I believe, yes.

Q. But do I understand your testimony a moment ago that you are not stating as

your opinion that all 108 million dollars of items which is the total of those lists are either unusual or infrequently occurring items within the meaning of those terms in accounting literature?

A. Not necessarily, no.

Q. Are you asserting an opinion that those items needed to be disclosed even if they were not either unusual or infrequently occurring?

A. Was your term needed to be disclosed, is that correct?

Q. Yes.

A. Yes.

Q. That is your opinion?

A. As I understood your question, yes.

Q. What's the basis, if those items are not, and we'll go through them in some detail in a moment, but if a particular item is neither unusual nor infrequently occurring within the meaning of GAAP, what is the basis for your opinion that it needed to be disclosed?

A. I guess I would have two responses to that. I don't know that I could the cover the ground for all the bases but the first that comes to mind with is conformance with ¶ 5(d) with respect to disclosure, not necessarily financial statement disclosures and the second thing that comes to mind is disclosures necessary to make the financial statements informative and useful.

Q. Well, I think I understand the first part of that answer and not the latter part. Are you saying that disclosure would be required to make the financial statements informative and useful, were you saying that that disclosure needed to be in the financial statements?

A. If it was necessary in order to make the financial statements informative and useful, yes.

Q. And it's your opinion that that would be required even if the item did not qualify as either unusual or infrequently occurring?

A. In some instances, yes.

Q. Just this catch-all, if it needed to be in there to make the financial statements informative and useful?

A. I don't know that I would refer to it as a catch-all but my terminology there is informative and useful.

(Dk.693, Ex. A, pp. 421–23).

 It would appear from Gibbs' testimony that the plaintiffs do not intend to assert a ¶ 5(d) warranty violation based on no more proof than a violation of the GAAP standards required by the warranty in ¶ 5(c).[3] The plaintiffs may or may not be asserting a ¶ 5(d) warranty violation based on the defendants' failure to disclose an incremental amount of information beyond that required by GAAP for any unusual or infrequently occurring item.[4] Instead, the plaintiffs ap-

---

**3.** If the plaintiffs, however, do intend to pursue a ¶ 5(d) warranty violation based on no more proof than a GAAP violation, the court grants the defendants' request and construes ¶ 5(d) as not incorporating the same express warranty made in ¶ 5(c). Absent this interpretation, the warranty in ¶ 5(c) would be rendered superfluous and meaningless. Consequently, proof of a GAAP violation will not suffice to prove a ¶ 5(d) warranty violation.

**4.** Gibbs did testify that there may be information which might materially affect an investor's valuation of stock but which is simply not required to be part of the financial statements. The court, however, did not come across any testimony by Gibbs revealing an opinion that the materiality standard of which he has knowledge would require disclosures beyond those required by GAAP for any items which were unusual or infrequently occurring within the meaning of GAAP. If the plaintiffs, however, will pursue such a theory, the plaintiffs should be prepared to demonstrate to the court under governing Kansas contract law

that the parties intended the warranty in ¶ 5(d) to impose additional disclosure requirements on financial matters that were also covered by GAAP. The court reserves its ruling on this issue for a more appropriate time, and it will not permit before that ruling an expert witness to opine that ¶ 5(d) was or was not violated under such a theory. The court agrees that expert witness testimony may be received on the meaning of technical terms used in an agreement but that an expert opinion is otherwise inadmissible to prove the proper interpretation of the agreement. " 'Absent any need to clarify or define terms of art, science, or trade, expert opinion testimony to interpret contract language is inadmissible.' " *North American Specialty Ins. Co. v. Myers*, 111 F.3d 1273, 1281 (6th Cir.1997) (quoting *TCP Indus., Inc. v. Uniroyal, Inc.*, 661 F.2d 542, 549 (6th Cir.1981) (citing in part *International Paper Co. v. Standard Industries, Inc.*, 389 F.2d 99, 102 n. 2 (10th Cir.1968))). The court likewise agrees that an expert witness necessarily interprets the SPA in opining that the failure to disclose certain information about unusual or infrequently occur-

parently intend to assert a ¶ 5(d) warranty violation for those items which were neither unusual nor infrequently occurring within the meaning of GAAP but about which the defendants had additional information that might have materially affected a prudent and knowledgeable investor's valuation of the KII stock.[5]

If the plaintiffs intend to pursue an allegation that the defendants failed to disclose information on items that are neither unusual or infrequently occurring under GAAP, then the court rules that such an allegation or theory is outside the plaintiffs' accounting claim as pleaded in the pretrial order and quoted here:

> KII employed accounting methods that were designed intentionally to understate KII's earnings and assets in the financial statements. Most importantly, KII knew that the selling shareholders and their advisors would consider the apparent trend of KII's earnings as a basis for estimating the value of KII shares and KII's ability to finance the buy-out price.
>
> To diminish its apparent earnings, KII therefore employed the following accounting practice which violated GAAP and constituted breaches of both warranties in the Stock Purchase and Sale Agreement (quoted above): **KII failed to disclose its unusual and/or infrequently occurring losses.** KII categorized these losses as recurring expenses or depreciation, thereby artificially reducing what appeared to be KII's ordinarily recurring income.

(Dk.676, p. 8) (emphasis added). The only accounting practice alleged in this claim is the defendants' failure "to disclose its unusual and/or infrequently occurring losses." In other words, the plaintiffs specifically limit their claim to the accounting treatment of losses that are "unusual and/or infrequently occurring." The plaintiffs do not plead any claim for the accounting treatment of losses that are not "unusual and/or infrequently occurring." Nor can it be ignored that the plaintiffs chose to define these losses with accounting parlance borrowed from GAAP. Consequently, if the plaintiffs do not prove first that the loss, to which the information applies, is "unusual and/or infrequently occurring," as those terms are defined and used in GAAP, then the plaintiffs may not assert the defendants' failure to disclose such information as part of their accounting claim as pleaded in the pretrial order. Nor will the court permit any expert to testify on disclosure requirements for losses that are not "unusual and/or infrequently occurring."

As for May's testimony, the plaintiffs clarify that he will not be asked to testify on the subject of what are "unusual or infrequently occurring" losses for a business like KII, but rather he will testify as to what GAAP requires in the treatment and disclosure of losses once determined to be either "unusual or infrequently occurring." Though there may be some overlap with Gibb's testimony, May's testimony does not appear at this time to be an instance of one expert vouching for another. Because May's exposure to the facts was limited to Gibbs' report and work papers, there is a danger that his opinion may be perceived as vouching for Gibbs. The court expects that the plaintiffs will do as they have represented and focus May's testimony on disclosure requirements for unusual and/or infrequently occurring items.

### McGraw's Testimony on Changed Method of Valuation and Assignment of Value to Premium for Control

The defendants take issue with the new report from the plaintiffs' expert witness on

---

ring items constitutes a violation of the ¶ 5(d) warranty.

**5.** In their response brief, the plaintiffs indicate they even may be asserting a GAAP violation for inadequate disclosures concerning items that were not unusual or infrequently occurring under GAAP:

> Plaintiffs must show that the way in which they were disclosed (or that they were not disclosed) in the financial statements failed to comply with the requirements of GAAP. Similarly, defendants' disclosures concerning these

items may have violated GAAP regardless of whether they were technically "unusual" or "infrequently occurring," as those terms are specifically defined in the accounting literature. As Mr. May explained in his deposition, GAAP requires that footnotes to financial statements "be reasonably adequate for an understanding of the financial statements" and that "when there is a choice of accounting principles that can be or are material to the financial statements, that those principles be disclosed." (May Dep.190-91).

(Dk.693, pp. 7-8).

damages, Kenneth W. McGraw of Patricof & Co ("McGraw"). The defendants argue that McGraw uses a new methodology in his latest report that essentially results in a $50 million increase in damages. The defendants ask the court to prevent McGraw from changing his methodology from that used in his 1992 report. The defendants' other objection with McGraw's report is its theory the plaintiffs are entitled to a premium ranging between 35 to 45% for selling a large block of stock that resolved an ongoing dispute over voting control. The defendants argue there is no factual basis for awarding the plaintiffs a premium for control. The defendants ask the court to preclude McGraw from testifying as to any amount of damages based on a premium for control.

To show that McGraw has changed his methodology, the defendants highlight the following damage calculations found in his 1992 report. Relying on figures extracted from other expert reports, McGraw set out the following as "Asset Values:" "Underreported oil and gas reserve value—$59,600,000 or $5.22 per share," "Understated real estate values—$66,400,000 or $5.82 per share," and "Value of undisclosed refinery enhancement—$316,000,000 or $27.69 per share" for a "Total adjustment to asset value of $442,-000,000 or $38.73 per share." (Dk.670, Ex. A, p. 3). In the report, McGraw discloses that he took the "asset value" for the undisclosed enhancement to KII's Pine Bend refinery from the Muse, Stancil report. McGraw's 1992 report then sets out what he labeled as "Operating Results" into three categories: "Adjustment to 1982 Net Income—$11,755,000 or $1.03 per share," "Undisclosed Non-recurring Expenses—$37,231,-000 or $3.26 per share," and "Undisclosed Expansion of Pine Bend Refinery—$36,350,-000 or $3.18 per share" for a "Total pro forma adjustments to operating results of $85,336,000 or $7.47 per share." (Dk.670, Ex. A, pp. 4–6). Using a price to earnings ("P/E") ratio of nine, the total adjusted value for operating results was $67 ($7.47 times 9). McGraw ended this section of his report with the following statement:

> Based upon the analysis briefly described in the foregoing, considering enhancements both to asset value and to earnings and the appropriate weighting of these

elements, Patricof is of the opinion that the fair market value shortfall resulting from the misrepresentations and inadequate disclosures was approximately $58 per share, or an aggregate shortfall to selling shareholders of over $315 million. In arriving at this conclusion, Patricof relied most heavily on the higher operating results which should have been disclosed to the selling shareholders.

(Dk.670, Ex. A, p. 6). In his deposition, McGraw explained this statement as follows:

> Q. So I'm assuming that $58 is some sort of a blend between $38 and $67?
>
> B. Yes, sir.
>
> Q. How far did you blend it? Was it one-third/two-thirds?
>
> A. Yes, two-thirds to earnings, one-third to asset based increases.

(Dk.670, Ex. B, p. 145–46).

The defendants contrast the above methodology with that used by McGraw in his new report of November 17, 1997, submitted as a result of the court's summary judgment ruling in July 11, 1997. Under the section entitled, "**Methodology,**" McGraw opens with the following paragraph:

> Patricof's 1992 reports treated two groups of items: those affecting asset values and those reflected in operating results. Measuring the effect on value of these two groups of items entailed the use of different methodologies. Patricof considered adjustments to value from both categories, and weighted them in arriving at a conclusion. However, since the court eliminated both of the items (underreported oil and gas reserve values and understated real estate values) whose impact was solely on asset values, it is now both simpler and more appropriate to determine the financial impact of the undisclosed items through their effect on operating results. This revised report quantifies the impact on value of the two remaining disclosure items.

(Dk.670, Ex. C, p. 2). The report then separately calculates the value of the undisclosed expansion of Pine Bend Refinery and the value related to undisclosed non-recurring expenses.

For the refinery, McGraw starts with the "market multiple approach" that estimates the annual impact on earnings and then values the impact by applying a market multiple of earnings. Using data supplied by Baker & O'Brien, McGraw observes that the annual contribution to KII's net income would be $36.6 million or $3.21 per share and applying a P/E ratio of 9 produced an indicated value of $330 million or $28.93 per share. Also from Baker & O'Brien's report, McGraw takes the "value of the Pine Bend refinery to a third party buyer both before and after the pending expansion to 155,000 barrels per day, using a discounted cash flow analysis." (Dk.670, Ex. C, p. 4). This difference in value is $239 million or $20.99 per share. In blending these two values, McGraw reports:

> Values resulting from the two approaches (the market multiple approach and Baker & O'Brien's 13 year discounted cash flow analysis) were weighted in the same proportion as in the Patricof 1992 reports, resulting in incremental value of $300 million, or $26.28 per share, related to the undisclosed Pine Bend expansion.

(Dk.670, Ex. C, p. 4) (footnote omitted).

For the non-recurring expenses, McGraw calculates the following:

> The total amount of undisclosed non-recurring expenses, net of undisclosed non-recurring income, was approximately $70.8 million. Net of taxes, this represented an addition to KII's 1982 sustainable earnings of approximately $35.4 million, or $3.10 per share. Applying a multiple of 9.0 times, the same multiple used in connection with the Pine Bend expansion, results in incremental value of $318 million, or $27.92 per share.

(Dk.670, Ex. C, p. 5). McGraw now directly adds this value with the Pine Bend value for a total of $54.20 per share or approximately $296 million. In effect, McGraw now exempts the determined value of non-recurring expenses from any weighting. If McGraw had used the same method employed in his 1992 report of giving 1/3 weight to refinery value determined by discounted cash value and 2/3 weight to the operating results value of the refinery and of non-recurring expenses, the defendants calculate that the totals would be $44.86 per share or approximately $245 million. By changing his methodology, McGraw minimizes the effect of the summary judgment ruling by over $50 million.

McGraw also opines that a premium in the range of 35 to 50% would be received in an arm's length transaction and would be a component of fair market value. Applying a premium of 35 to 45% results in a value of $73.18 to $78.60 per share, or $404 million to $434 million in aggregate value to selling shareholders. The defendants argue the record is clear that the plaintiffs did not seek a premium, did not negotiate for a premium, and did not receive a premium in the stock transaction. Thus, the defendants deny that there is any factual basis for calculating a premium for control as an element of damages.

In response, the plaintiffs say McGraw has not changed his methodology but only has recalculated the damages as required after the court's recent summary judgment ruling. Because McGraw explains his reasons and methods for recalculation, the plaintiffs argue that the defendants cannot claim any surprise. In McGraw's deposition taken in 1993, the defendants simply confirmed McGraw's weighting calculation but asked nothing about his reasons or rationale behind it. The plaintiffs remark that the defendants knew, as evidenced by their question, that McGraw used the weighting to "blend" the value of undisclosed assets with the value of undisclosed earnings. "Now defendants want the Court to *assume* that weighting must always be done, as a matter of law, even though defendants never asked that question at Mr. McGraw's deposition, and even though there is now *nothing left to weight* as a result of the Court's summary judgment decision." (Dk.692, p. 2). The plaintiffs say all asset-based values are now gone from the case, so there is nothing now to blend or weight. The plaintiffs contend the discounted cash flow method and the market multiple earnings method used to value Pine Bend are both "earnings-based methods of valuing a refinery." Finally, the plaintiffs say the proper blending of values is a matter of expert testimony and the defendants may cross examine McGraw about his reasons for weighting in 1992 and for not weighting in 1997.

The plaintiffs argue there is a factual basis for McGraw's calculation of a control premium. The plaintiffs have testified to their belief that they were entitled to receive a premium but that KII could not afford to pay one. The plaintiffs say their mistaken belief about KII's ability to pay a premium and their agreement to take the low-end of acceptable prices was the result of KII's misrepresentations about its cash flows. Thus, the plaintiffs believe they are entitled to a control premium as part of their fair market value of their stock.

### Ruling

After reviewing McGraw's reports and the submitted excerpts from his deposition, the court is convinced that McGraw has not simply recalculated the damages in light of the summary judgment ruling but has actually changed his methodology for calculating damages. The court has several reasons for reaching this conclusion. First, this is not the only change that McGraw made to his report to have the net effect of minimizing the summary judgment ruling's impact on the plaintiffs' total damages.[6] Second, McGraw begins his discussion under the "Methodology" section of his report by describing this particular change from the weighting adjustment in 1992 to the operating results only approach in 1997. Third, but most importantly, McGraw's explanation for this change is not justified by the facts as they appear in his report.

The first two reasons give the court cause to sharpen its inquiry into McGraw's explanation for the change. McGraw explains that the change is due to the court's dismissal of the plaintiffs' claims concerning the "underreported oil and gas reserves and understated real estate values whose impact was solely on the asset values" determined in 1992. (Dk.670, Ex. C, p. 2). According to McGraw, "it is now both simpler and more appropriate to determine the financial impact of the undisclosed items through their effect on operating results." *Id.* Even though McGraw and the plaintiffs deny the use of asset values, McGraw's current report reflects that he still is using them in his damage calculations and that he has simply limited his weighting of asset and earning values to the refinery claim only.

The $239 million or $20.99 per share value for Pine Bend found in McGraw's 1997 report is plainly the same kind of value that McGraw called an asset value in 1992. This latest value is the result of the same discounted cash flow analysis done by Baker & O'Brien and used by McGraw in his 1992 report to determine Pine Bend's asset value. The $316 million asset value for Pine Bend found in McGraw's 1992 report corresponds to the $239 million value found in McGraw's 1997 report. The smaller value in the later report is due to the court's dismissal of the plaintiffs' claim based on expanding the refinery to 175,000 bpd.

Just like in 1992, McGraw again blends what he called the "asset value" in 1992 and what he now calls the discounted cash flow value. He admits in his 1997 report that he resorted to the same weighting used in his 1992 report: "Values resulting from the two approaches ... were weighted in the same proportion as in the Patricof 1992 reports."

6. There are at least two other changes that either actually increased the plaintiffs' damages or that suggested new elements for increasing the total damage figure. The first change was discussed at length in the court's order (Dk.683) filed February 17, 1989, which threw out the plaintiffs' latest effort to recover damages based on allegations that had never before been made under the fair market value theory. McGraw's 1997 report for the first time in this case calculated damages for the understated value of KII's disclosed earnings by increasing the P/E ratio from 7.4 to 9. Besides offering this new calculation, McGraw in his report also speculated over the facts and circumstances that might be alleged so that the plaintiffs could claim they had been misled into using a 7.4 P/E ratio in 1983 to value KII's disclosed earnings. Though he included the discussion of this new damage element and calculation under the section he entitled, "Value Related to Undisclosed Non-recurring Expenses," McGraw never explained how this damage element had anything to do with the accounting damages or why he was now just offering this new damage element only a few months before trial. The other change in McGraw's report he does explain and attribute to Baker & O'Brien's latest revised values on KII's earnings from Pine Bend Refinery. That McGraw made two changes that increased damages and offered a third way for also increasing damages when one would assume his revised report would simply adjust his calculations downward for those claims dismissed by the court leaves an unmistakable impression with this court.

(Dk.670, Ex. C, p. 4). By weighting the asset value of Pine Bend prior to grouping the earnings-based value for Pine Bend with the earnings-based value of the undisclosed non-recurring expenses, McGraw has effectively exempted the latter earning-based value from the full weighting method used in his 1992 report. The plaintiffs' explanation that in 1997 McGraw is no longer using the asset values approach, no longer blending two values and no longer weighting different values is plainly contradicted by McGraw's own report and the record in this case.

The court also finds dubious factual support in the record for McGraw's explanation that the court's dismissal of the oil and gas reserve claims and real estate claims makes the new method "simpler and more appropriate." Under the 1992 report's calculation of asset values, these two claims constituted approximately 28% of the total asset value to be blended. The court's summary judgment ruling eliminated certain accounting claims that made up approximately 14% of the total earnings-based value to be blended. The dismissal of these two asset-value claims when considered in light of the dismissal of the other earnings-based value claims does not create a situation so remarkably different as to reasonably explain McGraw's decision to now exempt part of the earnings-based values from any weighting.

The court finds that a damages expert may not change his methodology after his deposition, after the close of discovery, and after the summary judgment ruling without offering a sound justification fully supported by the record. If this were a conventional case, the court would be more inclined to order McGraw to be deposed immediately at the plaintiffs' expense and to leave this change of methodology to the defendants' cross-examination and impeachment. This case, and for that matter, this issue are not what this court would call conventional. Knowing not only this case's factual complexity, but after poring over the briefs submitted on this issue, the court seriously doubts that the jury could ever effectively understand McGraw's change in methodology or his purported reasons, let alone assess the reasonableness of both. For the impeachment of McGraw to even have a chance of being effective on this point, the door would

have to be opened for the jury to hear about the claims on which the court has already granted summary judgment. For all of these reasons, the court grants defendants' motion insofar as McGraw may not change his methodology so as to limit the weighting to the refinery claim but rather he must follow his previous methodology and first group the earnings-based or market multiple value for the undisclosed expansion of Pine Bend with the earnings-based value for undisclosed non-recurring expenses and then blend or weight this total earnings-based value with the asset value or discounted cash flow value of Pine Bend.

The court denies the defendants' motion in limine to preclude damages calculation for a control premium. The deposition testimony cited by the plaintiffs creates enough of a factual question that the court believes this is an issue best reserved for trial.

*O'Brien's Testimony on the Value of Pine Bend Refinery*

The defendants move to exclude that testimony of the plaintiffs' expert witness, John O'Brien, concerning the valuation of their refinery claims. The defendants point out that O'Brien has used "a theoretical discounted cash flow analysis under which he opines that the refinery had a June 1983 value of over $1.2 billion at the 'disclosed' 130,000 bpd capacity plaintiffs allegedly believed in, and was worth $336 million more under its allegedly greater capacity." (Dk.671, p. 2). The defendants contrast O'Brien's valuations with those made by the plaintiffs' investment bankers at the time of the SPA and conclude that the "huge discrepancy between" these values "raises obvious red flags about his [O'Brien's] methodology." *Id.*

The defendants complain that O'Brien's valuation "is not based on data as to the refinery's actual cash flows but rather on a series of theoretical assumptions as to the refinery's cash flows." (Dk.671, p. 5). The principal assumption challenged is that Pine Bend would have a gross refining margin ("GRM") of over $9 per barrel of processed oil that would begin in June of 1983 and continue "undiminished for 13 years." *Id.* The defendants attack this GRM as based in turn "on an assumed GRM for Gulf Coast

refineries" and "on computer-modeled assumptions as to price/cost differentials between Pine Bend and Gulf Coast refineries and as to the particular product mixes at Pine Bend and in the Gulf Coast." *Id.* The defendants main contention is that O'Brien relies on these "counterfactual" assumptions which simply do not account for the actual margins of the general industry or of Pine Bend itself.

In response, the plaintiffs note that the defendants do not challenge that O'Brien is an expert on refinery valuations or that the discounted cash flow ("DCF") analysis is an "accepted method of estimating the going-concern value of refineries and other revenue-producing assets." (Dk.694, pp. 1–2). The plaintiffs observe that the defendants' attack on O'Brien's conclusions is the kind of analysis on which the Supreme Court said a district court should not engage. The plaintiffs say the investment bankers' lower valuations of Pine Bend were due to the defendants' misrepresentations and omissions. The plaintiffs argue the defendants do not levy any valid criticism with O'Brien's use of assumptions about Pine Bend's cash flow rather than Pine Bend's "actual" cash flow data. The plaintiffs say that DCF analysis is, by definition, an estimate of future cash flows produced by an assert over its anticipated life that is discounted to its present value. Consequently, the plaintiffs see the issue as not with whether O'Brien should have estimated future cash flows but with how those future cash flows should be estimated.

The plaintiffs describe the refinery industry in the early 1980s as depressed with marginal and inefficient refineries closing and with crude oil supplies becoming heavier and demanding the modernization of refineries. The plaintiffs observe:

Put simply, basic principles of economics dictated that refining capacity would diminish until margins returned to a level sufficient to trigger new capital investment in refining capacity. Realizing this, economists and refining industry experts at the consulting firm, Purvin & Gertz, Inc., developed a model in the early 1980s for estimating long-term average gross refining margins on the basis of the minimum average margins necessary to attract the capital investment required to meet anticipated demand for petroleum products. (citation omitted). This is the approach adopted by Mr. O'Brien. (citation omitted).

Purvin & Gertz' approach to estimating future refining margins was widely accepted in the early 1980s both by oil companies and by financial institutions, and was used in numerous refinery valuation studies performed at the time. (citation omitted). This approach to predicting future refining margins continues to be viewed by industry and financial experts as fundamentally sound, and continues to be widely employed in the industry and in energy forecasts published by the United States Department of Energy. (citation omitted).

(Dk.694, pp. 12–13). The plaintiffs maintain that O'Brien's approach was widely accepted in 1983 and continues to be widely employed today and that the defendants do not argue or cite any authority to the contrary.

### Ruling

The Supreme Court recently overturned the "austere" *Frye* standard of general acceptance which had required the exclusion of evidence based on scientific principles that were not so established as to gain general acceptance in that field. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 585, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *Summers v. Missouri Pacific R.R. System,* 132 F.3d 599, 602–03 (10th Cir.1997). The Court, however, also said:

That the Frye test was displaced by the Rules of Evidence does not mean, however, that the Rules themselves place no limits on the admissibility of purportedly scientific evidence. Nor is the trial judge disabled from screening such evidence. To the contrary, under the Rules the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.

509 U.S. at 589, 113 S.Ct. 2786. "Thus, while the Federal Rules of Evidence allow district courts to admit a somewhat broader range of scientific testimony than would have been admissible under Frye, they leave in place the 'gatekeeper' role of the trial judge in screening such evidence." *General Electric*

*Co. v. Joiner*, —— U.S. ——, ——, 118 S.Ct. 512, 517, 139 L.Ed.2d 508 (1997):

Faced with a proffer of expert testimony, the trial court " 'must determine at the outset pursuant to [Fed.R.Evid.] 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue.' " *Summers*, 132 F.3d at 603 (quoting *Daubert*, 509 U.S. at 592, 113 S.Ct. 2786). In short, the trial court is to ensure that the testimony is both relevant (helpful to the trier of fact) and reliable (scientific validity). *Summers*, 132 F.3d at 603; *Duffee v. Murray Ohio Manufacturing Co.*, 91 F.3d 1410, 1411 (10th Cir.1996).

"[W]hen the proffered expert relies on some principle or methodology," the trial court should consider a nonexhaustive list of nondispositive factors in determining whether the reasoning or methodology is scientifically valid or reliable: (1) Can it and has it been tested?; (2) Has it been subjected to peer review and publication?; (3) Does it have a known or potential rate of error?; and (4) Has it attained general acceptance in the relevant scientific community? *Compton v. Subaru of America, Inc.*, 82 F.3d 1513, 1518 (10th Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 611, 136 L.Ed.2d 536 (1996); *see Summers*, 132 F.3d at 603 n. 4). The focus in evaluating these factors rests upon "the principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595, 113 S.Ct. 2786. In *Joiner*, the Supreme Court clarifies that conclusions often cannot be entirely divorced from the methodology used in arriving at them:

> But conclusions and methodology are not entirely distinct from one another. Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered. (citation omitted).

7. The defendants offer no authority that valuations of refineries or income-producing assets

—— U.S. at ——, 118 S.Ct. at 519. As part of the pretrial evaluation, the trial court also must determine whether the expert opinion is "based on facts that enable the expert to express a reasonably accurate conclusion as opposed to conjecture or speculation [but] absolute certainty is not required." *Kieffer v. Weston Land, Inc.*, 90 F.3d 1496, 1499 (10th Cir.1996) (quoting *Jones v. Otis Elevator Co.*, 861 F.2d 655, 662 (11th Cir.1988)).

Because the discounted cash flow method for valuing income-producing assets is generally accepted, if not well-established, in the finance world, the defendants' only serious challenge to O'Brien's valuation is with the assumptions he used in his discount cash flow analysis. Though undoubtedly skewed to yield a high valuation, O'Brien's assumptions when considered in light of the record supplied by the plaintiffs are not what this court would consider to be "counterfactual," "unsupportable" or "unreasonable" or would reject as nothing more than conjecture and speculation. That O'Brien's assumed gross refining margin is higher than the actual margins experienced during the years of 1981 through 1983 does not prove that the assumed margin is unsupportable.[7]

O'Brien took his assumed margin of $4 for Gulf Coast refineries from a certain project in 1982 and 1983 done by Purvin & Gertz, a world-wide consulting firm specializing in energy and chemical industries, in which they had "estimated that a projected long term gross refining margin of $4 per barrel would be required to encourage upgrading investments and produce a balanced market." (Dk.694, Ex. P, pp. 322–23). O'Brien testified that this GRM was actually used in one or more valuation reports that he actually did or assisted in 1982 or 1983. *Id.* at 323–24. O'Brien further testified that he did a historical study for the nine-year period from 1974 to 1982 that confirmed the general accuracy of his assumed GRM. *Id.* at 328–30.

In arriving at the $9 GRM for Pine Bend, O'Brien used computer models with actual data produced during discovery to measure the differential between Gulf Coast margins and Pine Bend's margins. O'Brien's report

should be based principally on actual data available for the three preceding years.

even refers to documents from the early 1980s prepared by Koch Refining Company in which they estimate Pine Bend's advantage "over what was termed 'the break-even Gulf Coast refiner' was usually in the range of $5 to $6 per barrel." (Dk.694, Ex. A, p. 38). Finally, the record does not show that O'Brien assumed that Pine Bend would achieve a $9 GRM every year. Rather, he will testify that this would be the average GRM obtained by Pine Bend over a thirteen-year period.

At this time, the court is satisfied that the assumptions used by O'Brien in his discount cash flow analysis are based on methodology and calculations which clear the minimum threshold of financial validity. The defendants' criticisms with O'Brien's assumptions appear to be weaknesses in the underpinnings of his opinion that go to its weight not its admissibility. *Compton,* 82 F.3d at 1518. The court denies the defendants' motion in limine.

IT IS THEREFORE ORDERED that the plaintiffs' motion in limine (Dk.663) to exclude post 1985 lawsuits is granted in part and all counsel and parties are ordered not to refer to the following eight cases:

*In re Ann A. Linn,* filed February 3, 1988, in the United States Bankruptcy Court for the Western District of Oklahoma, Case No. 88–00711–TS.

*In re James P. Linn, Debtor,* filed February 3, 1988, in the United States Bankruptcy Court for the Western District of Oklahoma, Case No. 88–00712–TS.

*International Oil Resources, Inc. v. Michael P. Aquilina, et al./ Michael P. Aquilina v. William I. Koch, et al.,* filed March 3, 1988, in the United States District Court for the Central District of California, Case No. CV 88–01168 PAR (GXKx).

*Ann A. Linn v. James P. Linn,* decree of divorce filed January 5, 1989, in the District Court of Oklahoma County, Oklahoma, Case No. FD–88–8451.

*United States of America, ex rel. The Precision Company v. Koch Industries, Inc., et al.,* ("Precision I"), filed May 25, 1989, in the United States District Court for the Northern District of Oklahoma, Civil Action No. 89–C–437–C.

*United States of America, ex rel. The Precision Company v. Koch Industries, Inc.; et al.,* ("Precision II"), filed September 30, 1991, in the United States District Court for the Northern District of Oklahoma, Civil Action No. 91–C–763–B.

*Louis Howard Andres Cox v. William I. Koch, et al.,* filed November 21, 1991, in the United States District Court for the Western District of Oklahoma, Case No. CIV–91–1921–A.

*Marjorie Simmons Gray, et al. v. Louis Howard Andres Cox,* filed November 21, 1994, in Probate Court, Harris County, Texas Case No. 271283.

The court denies the plaintiffs' motion in limine to exclude evidence and references to the other seven lawsuits named in the plaintiffs' motion and evidence suggesting that William Koch is engaged in an "ongoing vendetta" against his brothers, Charles and David Koch;

IT IS FURTHER ORDERED that the plaintiffs' motion in limine (Dk.664) is granted in part and all parties and counsel are precluded from presenting evidence or referring to:

1) the parties' personal lives or lifestyles, including their marital or other personal relationships, recreational interests, hobbies, passions, political or religious beliefs or unrelated financial endeavors;

2) William Koch's refusal to pay Goldman Sachs its full contract fee for its work in Koch I and refusal to pay Jim Linn a promised settlement fee for his work in settling Koch I;

3) Any investigations or surveillance of the personal residences and offices of the parties, their counsel and agents;

and the plaintiffs' motion in limine (Dk.664) is denied as to evidence that the focus of the plaintiff William Koch's "psychiatric treatment" and "psychotherapy" was his troubled relations with his brothers;

IT IS FURTHER ORDERED that the plaintiffs' motion in limine (Dk.665) is granted and all parties and counsel are precluded from presenting evidence or referring to the comments, findings, or rulings made by this court or any other court concerning the

plaintiffs, the defendants or any of the claims in this case or any prior or pending litigation involving these parties;

IT IS FURTHER ORDERED that the plaintiffs' motion in limine (Dk.666) is granted to the extent that there will be no references or evidence concerning the dismissal or withdrawal of any claim or defense in this case but this does not preclude the defendants from introducing evidence that William Koch began investigating KII shortly after the SPA, that William Koch sent a pre-suit demand letter, and that the claims going to trial were not part of the case when it was filed;

IT IS FURTHER ORDERED that the plaintiffs' motion in limine (Dk.667) is granted and all parties and counsel are precluded from presenting evidence or referring to the plaintiffs' counsel or experts who have withdrawn or been replaced during this litigation, except for showing witness bias through evidence of what prior counsel may have instructed and paid expert witnesses;

IT IS FURTHER ORDERED that the defendants' motion in limine (Dk.668) is granted in part and all parties and counsel are precluded from presenting evidence or referring to the document destruction allegations or evidence found in or related to the Oklahoma litigation, and the defendants' motion is denied as to the gap in documents produced by the defendants concerning the Williams Pipeline reversal negotiations and/or agreement and as to the fact that Peat Marwick destroyed its work papers for the audits in 1981 and 1982;

IT IS FURTHER ORDERED that the defendants' motion in limine (Dk.669) is granted in part and the plaintiffs are not to allege or offer an expert opinion that ¶ 5(d) was violated based on no more proof than a GAAP violation; are not to offer an expert opinion that ¶ 5(d) was violated based on the defendants' failure to disclose an incremental amount of information beyond that required by GAAP for any unusual or infrequently occurring item until the court finds that the plaintiffs have demonstrated under governing Kansas contract law that the parties intended the warranty in ¶ 5(d) to impose additional disclosure requirements on financial matters that were also covered by GAAP;

and are not to allege or offer an expert opinion that ¶ 5(c) or ¶ 5(d) was violated based on the defendants failed to disclose information on items that are neither unusual or infrequently occurring under GAAP; **and** the defendants' motion in limine (Dk.669) to exclude the entirety of Alan May's testimony is denied upon the plaintiffs' representation that the focus of May's testimony will be on the disclosure requirements for unusual and/or infrequently occurring items;

IT IS FURTHER ORDERED that the defendants' motion in limine (Dk.670) is granted insofar as McGraw may not change his methodology so as to limit the weighting to the refinery claim but rather he must follow his previous methodology and first group the earnings-based or market multiple value for the undisclosed expansion of Pine Bend with the earnings-based value for undisclosed non-recurring expenses and then blend or weight this total earnings-based value with the asset value or discounted cash flow value of Pine Bend; and is denied on the request to exclude McGraw's damage calculations for a control premium;

IT IS FURTHER ORDERED that the defendants' motion in limine (Dk.670) to exclude John O'Brien's opinion testimony on the value of the Pine Bend Refinery is denied.